**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

UNITED STATES OF AMERICA,
*EX. REL.* JAMES DIETER and
KAREN SCHWENKE,

     Relators,

                                    CIVIL ACTION NO. 22 CV 240

CITY OF MILWAUKEE,

CITY OF MILWAUKEE COMMUNITY
DEVELOPMENT GRANTS ADMINISTRATION,

HOUSING AUTHORITY of the CITY OF MILWAUKEE,

MILWAUKEE COUNTY, and

MILWAUKEE COUNTY HEALTH AND
HUMAN SERVICES HOUSING DIVISION,

     Defendants.

## COMPLAINT

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)**

**DO NOT ENTER IN PACER**

RELATORS James Dieter and Karen Schwenke, by and through their attorneys, on behalf of the UNITED STATES OF AMERICA, for their Complaint against the City of Milwaukee, City of Milwaukee Community Development Grants Administration, Housing Authority of the City of Milwaukee, Milwaukee County, and Milwaukee County Health and Human Services Housing Division based upon personal knowledge and relevant documents, state as follows:

1

## NATURE OF ACTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made, used, presented, and caused to be made, used, or presented by Defendants and/or its agents, employees, and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("the FCA"). The Defendants' conduct described herein violates the FCA.

## INTRODUCTION

2.     The FCA was enacted during the Civil War and substantially amended in 1986. Congress amended the statute to enhance the federal government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive, and that the statute, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose that information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

3.     The FCA prohibits knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false or fraudulent record or statement material to a false claim. 31 U.S.C. §§ 3729(a)(1)(B). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

4.      The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  The complaint must be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.  Based on these provisions, *qui tam* Plaintiffs and Relators James Dieter and Karen Schwenke seek to recover all available damages, civil penalties, and other relief for the violations alleged herein.

5.      As described in more detail below, Defendants received funding from the Federal Government for the purpose of aiding low and moderate-income individuals, aiding disabled individuals, aiding minorities, addressing and eliminating blight conditions, and meeting needs that threaten the safety and welfare of persons of limited means within the City of Milwaukee.

6.      As a condition to receiving these federal funds, Defendants were required to certify compliance with federal laws prohibiting discrimination on the basis of race, color, national origin, and disability.

7.      As a condition to receiving these federal funds, Defendants were required to certify compliance with federal anti-discrimination statutes.

8.      As a condition to receiving these federal funds, Defendants were required to certify compliance with the Fair Housing Act.

9.      Defendants consistently and repeatedly ignored federal laws prohibiting discrimination while certifying compliance with these laws to the federal government for the disbursement of federal funds.

10.    Defendants consistently and repeatedly ignored federal laws prohibiting discrimination while certifying compliance with these laws to the federal government for the disbursement of federal funds.

11.    Defendants consistently and repeatedly ignored state and local laws and ordinances governing safe housing while certifying compliance with these laws and ordinances to the federal government for the disbursement of federal funds.

12.    Defendants consistently and repeatedly ignored federal, state, and local laws and ordinances promoting the goals of the Fair Housing Act while certifying compliance with these laws and ordinances to the federal government for the disbursement of federal funds.

13.    Over the past six (6) years, Defendants have received approximately $113,367,633.00 in federal funds through the U.S. Department of Housing and Urban Development for housing projects in the City of Milwaukee.

14.    Over the past six (6) years, the Milwaukee County Health and Human Services Housing Division has received approximately $25,000,000 in rent assistance funds from the U.S. Department of Housing and Urban Development.

15.    Over the past twelve months, Defendants have received approximately 179,000,000 in federal funds through the American Rescue Pan Act for the rehabilitation and construction of affordable homes as well as the demolition of unsafe structures in the City of Milwaukee. The City of Milwaukee expects to receive another $200,000,000 in federal funds through the American Rescue Plan in early 2022.

16.    Defendants have received these federal funds by and through the submission of false claims to the federal government.

## PARTIES

17.     RELATOR James Dieter is an adult resident of the State of Wisconsin with a residence located 2432 West Kilbourn Ave., Milwaukee, Wisconsin 53233. Dieter purchased this residence 2004. Dieter made the decision to purchase the historical, nearly 10,000 square foot home in Milwaukee's Near West Side neighborhood (as that term is defined, below) because the City of Milwaukee was in the process of developing a Near West Side Comprehensive Plan (as that term is defined, below) to improve and develop the neighborhood. Dieter was impressed by the City's inclusion of focus groups, community charrettes and resident input. The Comprehensive Plan contained an extensive rezoning strategy to decrease multi-family units and blighted properties while increase single-family homes and rehabilitation of existing structures. The City's dedication to improving the Near West Side was a key factor in Dieter's decision to purchase the residence.

18.     RELATOR Karen Schwenke is an adult resident of the State of Wisconsin who owns six (6) residential investment properties; three of which are located within the Milwaukee neighborhood known as the Near West Side (as that term is defined, below). Schwenke's decision to purchase the two properties in the Near West Side was intentional and based upon her thorough market research including, but not limited to, the City of Milwaukee's development of a Near West Side Comprehensive Plan (as that term is defined, below). The Near West Side Comprehensive Plan confirmed that the City of Milwaukee had developed a strategy to invest in this neighborhood for the purpose of removing slums and blight, reducing crime, and increasing owner-occupied homes. Schwenke was aware that bulk of funds for rehabilitating the Near West Side would be coming from the federal government. This federal funding and the City's stated

5

dedication to rehabilitating the Near West Side led Schwenke to purchase the investment properties in the Near West Side in 2004 and 2005.

19.    DEFENDANT City of Milwaukee is municipal corporation organized under the laws of the State of Wisconsin.

20.    DEFENDANT City of Milwaukee Community Development Grants Administration is a public agency authorized by the City of Milwaukee, laws of the State of Wisconsin, and federal laws to receive annual funding allocations from the federal government to fund actions (i) principally benefitting low/moderate income persons, (ii) preventing or eliminating slum or blight, and (iii) addressing urgent needs or problems in the community.

21.    DEFENDANT Housing Authority of the City of Milwaukee ("HACM") is a municipal corporation organized under Wis. Stat. § 66.1201. HACM is responsible for providing safe and sanitary dwellings to accommodate people of low income. HACM is required to perform its purpose without discrimination.

22.    DEFENDANT Milwaukee County is a municipal corporation organized under the laws of the State of Wisconsin.

23.    DEFENDANT County Health and Human Services Housing Division provides assistance to low-income owner-occupants and single-family homes and assist persons with mental illnesses find safe and affordable housing.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730.  Under 31 U.S.C. § 3730(e),

6

there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

25.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because the conduct, acts, and omissions at issue in this case occurred within this District.

## FACTS

### I.    As Recipients of Federal Funds, Defendants Are and Were Required to: (1) Certify Compliance with Anti-Discrimination Laws, and (2) Certify that they Affirmatively Furthered the Purposes of the Fair Housing Act.

26.    Defendants received federal funding from a number of sources including, but not limited to, the U.S. Department of Housing and Urban Development ("HUD"), National Housing Trust Fund, and the American Rescue Plan Act.

27.    Defendants received funds from HUD pursuant to four (4) separate programs including the Community Development Block Grant ("CDBG") program, HOME Investment Partnership ("HOME"), Emergency Shelter Grant ("ESG"), and Housing Opportunities for People with AIDS programs ("HOPWA").

28.    The purpose of the CDGB program is to aid low- and moderate-income individuals, address and eliminate slum and blight conditions, and meet needs that threaten the safety and welfare of persons of limited means.

29.    The HOPE program provides funds to rehabilitate and transform the most distressed public housing. This program focusses on remodeling or eliminating unsafe and dilapidated public housing.

30.    The ESG program focuses on the renovation, rehabilitation and conversion of buildings to be used as homeless shelters.

7

31.     The HOPWA program provides funding to prevent homelessness for low-income individuals with HIV/AIDS.

32.     The City of Milwaukee also receives funding from HUD through its Section 8 Housing Choice Voucher program ("Section 8"). The purpose of the Section 8 program is to help the City's very low-income families, elderly, and disabled afford decent, safe, and sanitary housing. Under this program, subsidies are used to pay owners or landlords the difference between what the tenant can pay and the cost of the rental unit.

33.     The funds received from HUD are distributed by the City of Milwaukee Community Development Grants Administration, HACM, and other divisions.

34.     Over the past six (6) years, the City of Milwaukee has received approximately $113,367,633.00 in funds through HUD. This amount only includes funds received through the CDGB, HOME, ESG, and HOPWA programs; it does not include funds received through the Section 8 program.

35.     Over the past six (6) years, the Milwaukee County Health and Human Services Housing Division has received approximately $25,000,000 in rent assistance funds from the U.S. Department of Housing and Urban Development.

36.     The City of Milwaukee received approximately $400,000,000.00 in federal funds from the American Rescue Pan Act in year 2021 with approximately $179,900,000.00 of those funds being allocated toward the rehabilitation and construction of affordable homes as well as the demolition of unsafe structures. The City of Milwaukee expects to receive another approximately $200,000,000.00 in federal funds from the American Rescue Plan Act in early 2022 which will be used for similar purposes.

37.     As a recipient of federal funds, Defendants are required to comply with Title VI of the Civil Rights Act (prohibiting discrimination on the basis of race, color, or national origin), Section 504 of the Rehabilitation Act (prohibiting discrimination on the basis of disability), and the Americans with Disabilities Act (prohibiting discrimination on the basis of disability).

38.     HUD ensures that recipients of HUD funds comply with these federal anti-discrimination laws by requiring the recipients to certify compliance with those laws. If a recipient does not certify compliance with those laws, the recipient will be denied funds from HUD.

39.     HUD also ensures compliance with these federal anti-discrimination laws by requiring recipients to submit various plans such as the Consolidated Plan and Annual Action Plan and Consolidated Annual Performance and Evaluation Reports ("CAPER"). The CAPER sets forth specific and detailed information regarding how the recipient spent federal funds received from HUD. Each year's CAPER can be found on the City of Milwaukee Community Development Grants Administration website, at https://city.milwaukee.gov/CDGA.

40.     "The Consolidated Plan is designed to help states and local jurisdictions to assess their affordable housing and community development needs and market conditions, and to make data-driven, place-based investment decisions. The consolidated planning process serves as the framework for a community-wide dialogue to identify housing and community development priorities that align and focus funding from the CPD formula block grant programs:" the CDBG, HOME, ESG, HOPWA, and Housing Trust Fund. *See* https://www.hudexchange.info/programs/consolidated-plan/.

41.     "The Consolidated Plan is carried out through Annual Action Plans, which provide a concise summary of the actions, activities, and the specific federal and non-federal

9

resources that will be used each year to address the priority needs and specific goals identified by the Consolidated Plan. Grantees report on accomplishments and progress toward Consolidated Plan goals in the Consolidated Annual Performance and Evaluation Report (CAPER)." *See* https://www.hudexchange.info/programs/consolidated-plan/.

42.     The Fair Housing Act ("FHA"), which is contained within Title VIII of the Civil Rights Act of 1968, requires the federal government and all recipients of federal funds to Affirmatively Further the Purposes of the Fair Housing Act ("AFFHA").

43.     The HUD has defined its AFFHA obligations as follows:

"The obligation to affirmatively further fair housing requires recipients of HUD funds to take meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics, which are:

Race

Color

National origin

Religion

Sex (including gender, gender identity, sexual orientation, and sexual harassment)

Familial status

Disability

Generally, in administering programs and activities relating to housing and community development, the federal government, HUD, and its recipients must:

- Determine who lacks access to opportunity and address any inequity among protected class groups

- Promote integration and reduce segregation

- Transform racially or ethnically concentrated areas of poverty into areas of opportunity."

*See* https://www.hud.gov/program_offices/fair_housing_equal_opp/affh.

44.     Senator Edward Brooke, co-author of the FHA, stated, "We make two general assertions: (1) that American cities and suburbs suffer from galloping segregation, a malady so

widespread and so deeply imbedded in the national psyche that many Americans, Negroes as well as whites, have come to regard it as a natural condition; and (2) that the prime carrier of galloping segregation has been the Federal Government. First it built the ghettos; then it locked the gates; now it appears to be fumbling for the key. Nearly everything the Government touches turns to segregation, and the Government touches nearly everything." Senator Edward Brooke, 114 Cong. Rec. S2280 (1968).

45.     The Federal Housing Act of 1949 was revised in 1954, in part, to address slums and blight in major metropolitan areas through the use of federal urban renewal funds. The FHA focused on the root sources responsible for creating blight and slums such as a failure to enforce building codes, failure to have and/or execute a proactive plan, failure to foster community involvement, and failure to address homelessness.

46.     The HUD statutes require program participants to certify, as a condition of receiving federal funds, that they will affirmatively further the purposes of the FHA.

47.     In 2021, the United States Government, via the White House, issued a memorandum to HUD underscoring that HUD and recipients of HUD funds are mandated "to take actions that undo historic patterns of segregation and other types of discrimination and that afford access to long-denied opportunities." *See*

https://www.hud.gov/program_offices/fair_housing_equal_opp/affh

## II.     The City of Milwaukee Continues to be the Most Segregated City in the United States.

48.     Although the Federal Housing Act succeeded to a degree on its overall polices, it was plagued by discrimination and containment policies. Many metropolitan areas, including the City of Milwaukee, found it much more profitable to create containment zones within the City's boundaries in which to house the City's low-income population, minorities, disabled individuals,

and criminals while simultaneously devoting substantial resources to neighborhoods comprised of middle to upper income, non-minority, and non-disabled residents.

49.     In post-World War II years, predominately white neighborhoods in Milwaukee's Near North Side were the focus of the City's federal funding to the detriment of the City's less fortunate, minority areas such as Milwaukee's Near West Side.

50.     The City of Milwaukee has engaged in a pattern and practice of vigorously furthering the purposes of the FHA by taking actions to eliminate discrimination, building code violations, and crime in non-containment zones while permitting discrimination, rampant building code violations, and crime within the containment zones.

51.     The City of Milwaukee has created containment zones where disabled, minority, and low-income individuals are treated as second-class citizens.

52.     The City of Milwaukee has intentionally discriminated against the residents of the containment zones based upon their overwhelming composition of minority, disabled, and low-income residents.

53.     Within the containment zones, zoning ordinances and building codes are ignored, development is discouraged, densification is compounded rather than reduced, community involvement is disregarded, crime is permitted, and community plans are overlooked.

54.     Containment zones were and are the City's answer to housing its disabled, minority, and low-income population.

55.     The City of Milwaukee has not changed over the years. The City of Milwaukee remains at the top of the list as the most segregated city in the nation.

https://www.brookings.edu/blog/the-avenue/2018/12/17/black-white-segregation-edges-downward-since-2000-census-shows/.

56.     The goal of the City of Milwaukee has been and remains to maintain and perpetuate these containment zones while continuing to receive the full benefit of federal funds that, ironically, were supposed to be used to eradicate slums, blight, segregation, discrimination, and other unfair housing practices.

57.     The City continues to ignore HUD's requirement that the City adhere to federal non-discrimination laws, the FHA, and state and local housing laws as a condition to receiving federal funds.

58.     The City continues to ignore the FHA's requirement that the City take intentional, affirmative steps to overcome patterns of segregation, eliminate discrimination in housing, and foster a community that assists individuals of low to moderate income as a condition to receiving federal funds.

59.     The City has unlawfully created containment zones within its boundaries wherein discrimination and lawlessness is the norm and residents are treated with disdain and contempt.

60.     While the City has received hundreds of millions of dollars from the federal government to eradicate discrimination, segregation, blight, and slums from these areas and assist the disabled, low-income, and minority residents, these containment zones have remained unchanged for decades.

III.    **A Neighborhood Example of a City-Wide Problem: The City of Milwaukee Created a Containment Zone in the City's Near West Side by Refusing to Adhere to Anti-Discrimination Laws and Refusing to Affirmatively Further the Purposes of the Fair Housing Act.**

61.     "[T]he Near West Side is located west of I-43, north of I-94, east of U.S. 41, south of Vliet Street, west of N. 27th Street, and south of Galena Street east of N. 27th Street." *See* Near West Side Comprehensive Plan, 4 (2004),

13

https://city.milwaukee.gov/ImageLibrary/Groups/cityDCD/planning/plans/Near-West/plan/NearWestPlan.pdf. (Exhibit A).

62.     To combat the worsening conditions of Milwaukee, a Milwaukee Comprehensive Plan for the Near West Side, also known as the Near West Side Comprehensive Plan (the "Comprehensive Plan"), was developed in 2004.

63.     The City of Milwaukee approved the Comprehensive Plan in March 2004 and incorporated the Plan into the City's overall Plan.

64.     The City of Milwaukee's Department of City Development, Department of Neighborhood Services, and Department of Public Works as well as other City departments and agencies were (and are) directed to undertake action to implement the Comprehensive Plan.

65.     The goals of this Comprehensive Plan fall within four categories: Residential Goals, Commercial Goals, Institutions and Public Spaces Goals, and Transportation Goals.

66.     The residential goals are to "[s]trengthen and improve the existing neighborhood fabric," and to "[i]ncrease owner-occupancy throughout the Near West Side." *Id.*

67.     The commercial goals are to "[c]reate retail destinations that utilize existing commercial land and infrastructure," and to "[e]nhance the marketability of commercial nodes to promote economic stability and growth." *Id.*

68.     The institutions and public spaces goals are to "[i]ncrease sense of security throughout the Near West Side," and to "[e]nhance public destinations and gathering places for residents and visitors." *Id.*

69.     The transportation goals are to "[r]ecreate historic neighborhood traffic patterns to maximize route alternatives," and to "[i]mprove the viability of transportation alternatives." *Id.*

14

70. Part of the Comprehensive Plan involved interviewing "stakeholders" of the area planned for investment. Conclusions made by the interviewees were considered when directing the location for redevelopment funding. The interviewees believed it would be valuable to the community if apartment structures were demolished if they "are without significant historic or architectural value and are severely deteriorated, have abandoned units, or are chronic sources of neighborhood crime and drug abuse." *Id.* at 27.

71. The interviewees indicated that depreciating property values relative to other areas in the city supported comprehensive rehabilitation and maintenance. *Id.* In addition, the interviewees said, "fear of crime and concern about the large number of group homes and other social service agencies creates uncertainty in the marketplace and discourages individual reinvestment in the neighborhoods." *Id.* Based on the responses from the stakeholders, the consulting team recommended that City Programs should work toward more owner occupancy of single- and two-family homes in these neighborhoods. *Id.*

72. Household surveys were conducted on the Near West Side for the purpose of gaining public participation for the Plan. Over 79% of respondents to the household surveys wanted to see increased homeownership on the Near West Side because they believed it would improve the area. *Id.* at 38-9. Those surveys also revealed that 63.8% of respondents wanted to see increased property maintenance/code enforcement in the Near West Side. *Id.*

73. The Comprehensive Plan also created three focus groups for stakeholders in the Near West Side. The focus groups put forth several ideas as to how the area should best be improved. The focus groups concluded that the City of Milwaukee must take the lead on bringing these ideas to fruition. Specifically, the groups indicated that the City should begin the process by "helping to remove blight, acquiring properties for demolition and making the parcels

15

available to developers, [and] addressing transportation [and parking] issues." *Id.* 42-3. The focus groups believed these actions would encourage homeowner residents, developers, and businesses while decreasing densification and eliminating blight and slums.

74. Community charrettes also were used as a method of public participation to further develop the issues to be addressed in the Comprehensive Plan. During these community charrettes, the community was encouraged to present evidence regarding important neighborhood issues and discuss how best to remedy those issues. The community also was encouraged to provide input as to what the residents wanted for the future of their neighborhood. Some of the most important policies highlighted were an increase in residential code enforcement, rehabilitation of the single-family homes in poor condition, conversion of apartments into condominiums, and to create more owner-occupied homes. *Id.* at 44.

75. The Comprehensive Plan also included a land use policy. *Id.* at 46. One of the main focuses of the project was to work with residential land use. *Id.* at 47. The residential policies "address (1) land use compatibility; (2) design for the redevelopment, rehabilitation and preservation or existing housing stock; and (3) the development of new residences to increase owner-occupancy throughout the neighborhood." *Id.* at 47.

76. The land use policies were meant to discourage the creation of community living arrangements. *Id.*

77. In addition, there was a policy "for all residential rehabilitation and new development" to "[i]nclude architectural elements that are compatible with the character of the area." *Id.* at 48. Some examples are "front porches, connecting sidewalks, rear garages, windows facing the street, and traditional articulation of facades." *Id.* The exterior entrances to the homes and walkways to the homes "should be well lit at night. *Id.*

16

78.     The Comprehensive Plan directed the use of a redevelopment strategy whereby "spot acquisition" would be used when a property has many code violations or is deemed a nuisance property. *Id.*

79.     Finally, the Comprehensive Plan was put into place to "reduce the density and isolation in all public housing developments." *Id.*

80.     A historical review of the Near West Side demonstrates Defendants' failure to follow the Comprehensive Plan. Relatively little, if any, positive changes have been made in this neighborhood over the past several decades. The overall slum and blight in the neighborhood had persisted throughout this time to the exclusion of new development.

81.     Data from the 2000 U.S. Census was used by the City in creating the Comprehensive Plan in 2004. The 2000 census data revealed that the population density of the Near West Side was 11,945 persons per square mile while the rest of the City of Milwaukee averaged 6,251 persons per square mile. *Id.* at 6.

82.     The Near West Side density level remains nearly double that of the other City of Milwaukee neighborhoods and is comprised mostly of low-income, minority, and disabled individuals.

83.     The Near West Side is one of the most segregated areas in the City of Milwaukee. Recent statistics show that approximately Eighty-Two Percent (82%) of the Near West Side is comprised of minorities.

84.     The Near West Side is oversaturated with homeless beds. The State of Wisconsin consists of 65,496 square miles and has 772 zip codes. Over 15% of the State's homeless beds are located within the three (3) zip codes comprising the Near West Side (a 2.6 square mile area).

85.     The Near West Side is oversaturated with rooming houses. There are fifty-nine (59) rooming houses within the 4th Aldermanic District. (Exhibit B). Fifty-four (54) of those rooming houses are within the Near West Side.

86.     In total, there were 125 rooming houses within the entire City of Milwaukee. This means that over 43% of the City of Milwaukee's rooming houses are located within the 2.6 square mile area of the Near West Side. The City of Milwaukee consists of 96.1 square miles.

87.     Dieter has nine (9) rooming houses within 1 ½ blocks from his residence.

88.     An oversaturation of rooming houses leads to the densification and destruction of the neighborhood. "Rooming houses have become notorious as both symptoms and causes of neighborhood decay in many cities." *See* American Planning Association, https://www.planning.org/pas/reports/report105.htm.

89.     While State and local ordinances support the denial of a rooming house license where there is an oversaturation of rooming houses within a geographic area, the City of Milwaukee has deliberately chosen to ignore the ordinances in favor of concentrating rooming houses within the Near West Side. *See* License and Permit Procedures, Chapter 85-2.7(4)(c).

90.     Consolidating rooming houses within containment zones, which comprise very small geographic areas within the City as a whole, allows the City to effectively contain low-income, disabled, minorities in a very specific area. Within these containment zones, building codes and zoning ordinances are not enforced, blight and slums are the norm, and crime is permitted. Law enforcement contains the crime rather than stops the crime.

91.     Dieter and Schwenke relied upon the Comprehensive Plan when deciding to invest in the Near West Side. The Comprehensive Plan confirmed to Dieter and Schwenke that, at least in 2004, the City of Milwaukee intended to focus on the Near West Side when allocating

18

federal funds to improve housing conditions, decrease densification, eliminate blight and slums, reduce discriminatory practices, and fund redevelopment projects in the area.

92.    Since investing in the Near West Side, Schwenke and Dieter have observed that the City of Milwaukee has ignored federal laws regulating housing with respect to disabled individuals, ignored slum and blight conditions, ignored the adverse impact on people of color, ignored crime, ignored building code violations, and ignored zoning ordinances.

93.    Dieter and Schwenke have been actively engaged and involved in the Near West Side for almost two decades.

94.    Dieter has lived in the Near West Side and Schwenke has owned rental properties in the Near West Side since 2004. Both Dieter and Schwenke have personally witnessed the Near West Side become more blighted and segregated over the years despite the alleged influx of tens or hundreds of millions of dollars.

95.    Dieter and Schwenke have observed the disparate treatment of residents within the Near West Side where low-income, minority, and disabled individuals are subjected to horrendous living conditions simply because the City has a goal to contain such individuals within very small geographic areas.

96.    Dieter and Schwenke have actively observed the Near West Side being used as a containment zone over the last two decades.

97.    The City of Milwaukee has ignored and violated the Comprehensive Plan, Consolidated Plans, and Annual Action Plans in furtherance of its creation and perpetuation of the containment zones.

98.    Dieter and Schwenke have observed the City refusing to enforce building codes within the Near West Side for the purpose of perpetuating the containment zone. Building codes

19

are enforced against property owners who are affluent or live outside these containment zones while rooming houses and owners of blighted, unsafe properties within the containment zones are permitted to continue renting the properties to low-income residents who are largely minorities; many of which are disabled.

99.     The City has ignored and/or violated its zoning ordinances, licensing regulations, and building codes within the Near West Side for the purpose of perpetuating the containment zone. Examples of this disparate treatment include, but are not limited to, the following:

a. The Department of Neighborhood Services (DNS) gives no consideration to the community members that live near or inside these blighted buildings when considering the greater good of the community. Despite community members providing compelling testimony at committee meetings regarding the blight, segregation, and safety issues facing the neighborhood, the City has continued to permit the operation of unlicensed rooming house, refused to enforce building codes, and ignored the cries for help from the disabled and vulnerable population.

b. The DNS is required to universally apply the Milwaukee code of Ordinances within the City of Milwaukee. This fact was confirmed during a May 19, 2020 City of Milwaukee Board of Zoning Committee Meeting by DNS Commissioner Erica Roberts (formerly, Erica Lewandowski at the time of the meeting). However, the DNS does not apply building codes to rooming houses, and other blighted buildings within the Near West side of Milwaukee (May 19, 2020 City Board of Zoning Hearing at time stamp 2:43:09).

c. Dieter and Schwenke have made many complaints to the City regarding building code violations within the rooming houses and other structures, and requested that

building codes be enforced. The Alderman for District 4 confirmed to the City of Milwaukee that the Clark House rooming houses had numerous building code violations and substandard maintenance. The Alderman also confirmed that the rooming houses created extreme blight within the community.

d. Several prevalent building code violations are visible form Dieter's home and the street. Those include, but are not limited to, missing and degrading siding, holes in the roof, rotted 2x4's for railings on steps, broken and degrading windows, and blight (September 11, 2019 Licensing Committee Hearing at time stamp 9:21:37). Each of these issues constitutes a building code violation that is supposed to be enforced by the City through the DNS but are not.

e. On the rare occasion that the City issues a work order for a rooming house, Dieter and Schwenke have observed that the order is not enforced. The code violation is permitted to continue unabated, which causes more blight and safety issues for the residents and public.

f. Tyrone St. Junior, Assistant City Attorney for Milwaukee, read the law for clarification at the City of Milwaukee Licensing Committee meeting on July 14, 2020. He stated,

"[t]his [rooming house] license functions pretty similarly to every other license that the city issues. Including liquor licenses and tavern licenses . . .. Some things the committee needs to consider [when giving the license] are the effect that the [licensed] activity will have on the surrounding neighborhood, whether or not the neighborhood is oversaturated with other types of businesses that are the same types of businesses that are going on here, the health, safety, and welfare of both the people frequenting the business itself, or in this case living at the business itself, and the effect that that has on the surrounding neighborhood. Police resources that are being dedicated to the area, will this [license] put an undue burden on the police department. With regard to this specific license, one thing that probably

21

should be considered by this committee that is not normally considered in other circumstances, is the condition of the building itself."

(July 14, 2020 Licensing Committee Hearing at time stamp 3:52:00). St. Junior further stated, "[i]f there is mold, if there is water, if the place has a fire hazard, this committee should be considering that type of information also [when granting or renewing a rooming house license]." (*Id.* at 3:53:30). Despite the state of the law and an acknowledgement by the City that it must follow the law, the City continues to disregard the law when it comes to its application in a containment zone such as the Near West Side.

g. The City has violated various licensing laws and zoning ordinances in its efforts to perpetuate the Near West Side containment zone. Examples of this conduct are as follows:

   i. Within the Near West Side containment zone there is set of five (5) rooming houses referred to as the "Clark House" rooming houses. The Clark House rooming houses are located on the intersection of 24th St. and W Kilbourn Ave., having the following addresses: 933 N 24th St., 939 N 24th St., 943 N 24th St., 947 N 24th St., and 2424 W Kilbourn Ave.

   ii. The Clark Hose rooming houses are comprised predominantly of very low-income, disabled, and minority individuals.

   iii. Anthony Katchever ("Katchever") owned the Clark House rooming houses as a sole proprietor until January 9, 2020, at which time they were sold to ProBuColls Association ("ProBuColls").

22

iv. Katchever and ProBuColls both operate the Clark House rooming houses by accepting federal funding that has been distributed to the City of Milwaukee and Milwaukee County.

v. The Milwaukee County Housing Division, funded in part by Community Development Block Grants (CDBG), agreed in 2018 to fund 16 rooming house apartments by paying above average market rent for 15 years. (July 14, 2020 Licensing Committee Hearing at time stamp 7:22:10).

vi. The City of Milwaukee uses other sources to fund the rooming houses such as the Wisconsin Housing and Economic Development Authority (WHEDA), the U.S. Department of Housing and Urban Development (HUD), the Low-Income Housing Tax Credit (LIHTC), and the National Housing Trust Fund.

vii. Katchever, as a sole proprietor, held the Clark House rooming house licenses in his own name and not in the name of a company. Therefore, the rooming house licenses were not transferrable to a new owner. Accordingly, ProBuColls did not receive rooming house licenses from the City of Milwaukee to operate the five (5) rooming house upon purchasing the Clark House rooming houses.

viii. DNS sent Dieter a letter confirming that ProBuColls had been actively operating the five rooming houses without a valid license. (Exhibit C) DNS further confirmed that the five rooming houses would continue operating while the new owner applied for a license. Milwaukee Aldermen expressed their frustration with City for permitting the rooming houses to

23

operate without a valid license during a licensing meeting on July 14, 2020. Regardless, the City permitted the rooming house to continue operating without valid licensure.

ix. In the same letter from DNS to Dieter reference above, DNS misrepresented facts to Dieter by indicating that the five Clark House rooming houses were "not subject to the zoning code unless an intensification of the premises occurs." (Exhibit C). The Milwaukee Code states that a change in zoning applicable to the property is a consideration to outright cancel a license already in existence. *See* Chapter 85-15(2)(d-3) (License and Permit Procedure).

x. In keeping with the Near West Side Comprehensive Plan, the Clark House rooming house located at 939 N 24th St., 943 N 24th St., 947 N 24th St., and 2424 W Kilbourn Ave. were rezoned by the Milwaukee Common Council from RM6 to RT3. The City's zoning ordinance indicates that RM6 lots are made "to promote, preserve and protect neighborhoods intended primarily for high-density multi-family residential uses. These districts allow a wide range of lot sizes, smaller setbacks, and a high percentage of lot coverage." Subchapter 5 Residential Districts, Zoning 295-501(3)(c). This type of zoning is allowed to have rooming houses. (Exhibit D).

xi. The City's zoning ordinance indicates that RT3 lots are meant "to promote, preserve and protect neighborhoods intended primarily for two-family dwellings with a traditional urban character. . .. However, it does not allow the establishment of new, multi-family buildings." Subchapter 5

24

Residential Districts, Zoning 295-501(2)(b). This type of zoning is not allowed to have rooming houses. (Exhibit D)

xii. Katchever was permitted to continue operating the Clark House rooming houses despite the zoning change, as he was "grandfathered" under the ordinance. Upon sale of the properties, however, the new owner was required to abide by zoning change.

xiii. ProBuColls attempted to "renew" the rooming house license for 2424 W. Kilbourn Ave. on July 14, 2020. During the hearing, Dieter informed the City that the zoning for this property had been changed in or around 2005 and that ProBuColls could not operate a rooming house on that property any longer. Dieter also informed the City that ProBuColls had been operating the rooming house illegally since the sale of the property because it did not have a valid license. Keith Stanley, Executive Director for Near West Side Partners, testified that the Near West Side was oversaturated with rooming houses and low-income housing. ProBuColls admitted to operating the rooming house without a valid license, and therefore the City denied ProBuColls a rooming house license for 2424 W. Kilbourn Ave.

xiv. In September 2020, the City "renewed" the licenses for the remaining four (4) Clark House rooming houses despite the fact that (i) they had been operating illegally without a license since the property sale, and (ii) the properties had been rezoned RT3 since in or around 2005, which precluded the operation of a rooming house. The City had circumvented

25

the standard hearing process as a means to grant these licenses. Prior to the hearing, Dieter, through counsel, contacted the City Attorney to inquire when the license applications were coming on for hearing before the City. The City Attorney informed Dieter's counsel that the licenses were not on the City's agenda. Dieter later became aware that the City had granted rooming house licenses to the four (4) remaining Clark House licenses.

   xv.   The following hear, 2021, Dieter contacted the City in June 2021 to inquire about the deadline for objecting to rooming house licenses for the Clark House rooming houses. Jim Cooney, License Division Manager, told Dieter that his objections and materials must be submitted by July 13, 2021. Dieter submitted his objections and evidence on that date.

   xvi.   Dieter later became aware that the City also intended to hold the hearing (without prior notice) on the rooming house licenses on July 13, 2021. Dieter attended the hearing and objected to the issuance of the rooming house licenses. The City instructed the council members that they could not consider the written information submitted by Dieter in opposition to the licenses because the information allegedly had not been submitted timely. Dieter informed the council that Mr. Cooney had instructed him to submit the information on July 13, 2021. Notwithstanding, the council was told that it could not consider the evidence submitted by Dieter in opposition to the licenses.

   xvii.   The City approved rooming house licenses for the four (4) Clark House rooming houses.

xviii. To date, four (4) of the five (5) Clark House rooming houses continue to operate despite the licenses not being transferrable from the previous owner and the zoning ordinance's prohibition of rooming houses on those lots.

h. These same 5 Clark House rooming houses were observed by Scott McLean, a Milwaukee building and home inspector with just under 30 years of experience. Mr. McLean testified in a license renewal hearing for the five rooming houses on July 13, 2021, (July 13, 2021 Licensing Committee Hearing at time stamp 8:29:30 – 8:47:00). As part of his testimony, Mr. McLean submitted a 90-page report on the properties and provided the following information:

i. Among the building code violations, Mr. McLean noted serious issues with the chimneys of all five of the buildings. None of the chimneys had liners in them, but liners have been required in the city of Milwaukee for decades. Without the liners, chimneys do not draft correctly, which Mr. McLean indicated is a major safety hazard for the residents. Mr. McLean's takeaway from the lack of liners in the chimneys was that no permits were issued for the installation of heating and hot water tanks. He confirmed that this is true because the City would have required, as they do everywhere else, that there be a liner inside the chimney. Mr. McLean also noted that the chimneys appeared as though they were about to fall over, which was another significant safety hazard. Mr. McClean indicated that he had never seen a property that was allowed to be in such poor condition.

27

ii.  Mr. McClean confirmed that the electrical meter in the alley had been disconnected from the rooming house on the alley leaving exposed wires. He indicated that there are myriad major electric fire hazards running throughout the building because of all the exposed wires.

iii.  Mr. McLean documented a severe structural issue with the stone wall in the alley that is the base support for the property at 947 N 24th St. He indicated that the 9-foot stone wall was bowing 8 inches outward and that the outward lean created a high probability for a building collapse. The City had been aware of that particular issue for over one year. The issue was brought to light by Kevin Jankowski, another engineer, who submitted the attached report, confirming that the wall was a major safety and structural issue. (Exhibit E, March 3, 2020 Engineering Report of Briohn Design Group, LLC). Jankowski confirmed the following issue at this property:

> "tipped outward significantly and there is cracking of old-tuck-pointed repairs that indicate the wall is continuing to move laterally. The wall joints show significant deterioration especially at the base. In my opinion, the wall has functioned properly as a foundation wall for many years, however, the on-going movement and deterioration of the wall brings into question the overall stability of the wall as it exists in place. Typically walls of this construction that are in the process of failing and in the condition of this wall need to be re-built."

Jankowski indicated that the wall could be a serious danger to the public walking in that alleyway. Dieter submitted the attached report to the City so the issue would be resolved. To date, the City has done nothing to remedy the safety and structural issue.

28

iv. Mr. McClean documented the fiber glass roofing on one of the Clark House properties. This type of roofing material is not permitted in the City of Milwaukee. It is a code violation and has been reported to the City. Despite the report, the City has done nothing to remedy the issue.

v. Mr. McLean documented code violations related to the steps and handrails entering the building of the Clark House properties. He indicated that the handrails were made using 2x4's, which is not allowed pursuant to the building codes. The railings must be graspable. He further indicated that the railings and their connection to the steps are rusting so much that they move significantly when used.

vi. During his inspection, Mr. McLean was approached by someone from one of the rooming houses who asked him if he wanted to buy some drugs and told Mr. McLean that that location was his corner for drug dealing. Within the next 10 minutes, Mr. McLean was inspecting the alley on the edge of the Clark House properties where he witnesses a pair of individuals run out of the alley pulling their pants up as they ran.

vii. Mr. McClean submitted a summary of his observations in an email dated July 13, 2021. (Exhibit F)

viii. The Clark House rooming houses have been observed to include exposed, and in some cases rotting, plywood for flooring, mold, falling plaster from the ceiling and walls, holes in the ceilings and in the roof, chipped and peeling paint, leaks, open and exposed electrical wires, and myriad other problems. (September 11, 2018 License Committee Hearing at time stamp

29

6:38:06 – 6:38:36; and September 10, 2019 License Committee Hearing at time stamp 8:53:21 – 8:56:27 and 9:19:00 – 9:19:35).

ix. The rooming houses have numerous exterior issues as well such as leaking roofs, siding falling off the houses, missing siding, rotting and damaged windows, unsafe chimneys, etc. (September 10, 2019 License Committee Hearing at time stamp 8:55:15 – 8:56:53; September 11, 2018 Licensing Committee Hearing at time stamp 6:34:09 – 6:38:00).

x. Dieter and Schwenke later learned that the City has stopped inspecting the rooming houses for building code violations. Instead, the City only inspects the rooming houses for environmental issues including such things as exit signs and fire extinguishers.

xi. Despite the magnitude and seriousness of these verified building code violations, the City renewed the license for all of the Clark House properties at the July 13, 2021 meeting.

i. Presently, in February, 2022, the Clark House rooming houses located at 943 N. 24th Street has been without operational plumbing or running water for approximately ten (10) days. As of the date of filing this Complaint, the plumbing issue and lack of running water continues. Residents of this rooming house have been required to walk to one of the other Clark House rooming houses to use running water and the bathroom facilities. Sewage has backed up inside the rooming house. On information and belief, the owner of the rooming house has begun repairs on the plumbing without pulling any permits.

30

j.  The City has used its authority to deny licenses in non-containment zone areas of the City.

    i.  On July 17, 2018 the City of Milwaukee considered a license for an extended-stay hotel, WoodSpring Suites, which was to be located on the south side of Milwaukee near the airport.

    ii.  Alderman Terry Witkowski and residents of the neighborhood expressed their grave concern that this facility would create crime and blight in the neighborhood.

    iii.  The City of Milwaukee denied a license for the proposed facility based upon these concerns.

k.  The City has used its authority to shut down rooming houses in non-containment zone areas of the City. On August 5, 2020, the City shut down a rooming house located at 2169 South 15th Place following an emergency order issued by the DNS. The DNS had inspected the rooming hose and found nine (9) violations. One of the violations was that the rooming house was operating without a valid license.

l.  The City of Milwaukee has been made aware of the extensive, ongoing building code violations at the Clark House rooming houses. The City of Milwaukee also knows that the Clark House rooming houses have been and are operating without valid licenses. The City of Milwaukee has permitted the Clark House rooming houses to operate despite these violations. The only difference between the Clark House rooming houses and the other rooming houses referenced in paragraphs (i) and (j), is that the Clark House rooming houses are located within the containment

31

zone. Residents living within the containment zones are treated less favorably than all other residents.

m.  Despite the City's affirmative obligation to enforce building codes when considering a license for a rooming house, the City has ignored the codes for the purpose of maintaining a containment zone for the City's low income, minority, and disabled residents.

n.  During a May 19, 2020 Board of Zoning Committee meeting, it was announced that in March 2020 DNS suspended monthly reinspection programs for a group of 700 chronically negligent properties in Milwaukee. DNS stopped issuing inspection bills and conducting inspections during this time period. DNS refused to enforce all orders issued from February 2020 to the date of the meeting, May 19, 2020. Those orders included exterior and interior violations on properties previously noted by DNS. Alderman Bauman confirmed that DNS did not have the authority to suspend the bills and inspections on these negligent properties. Many of the properties on the negligent property list were rooming houses used by low income, minority, and disabled individuals.

100.    The City of Milwaukee is required to enforce its building codes for the safety and welfare of its residents as well as to affirmatively further the purposes of the FHA.

101.    The City of Milwaukee does not enforce building codes within the Near West Side (and other containment zones) because it is a containment zone and the City of Milwaukee wants to continue housing its low-income, disabled, and minority population within this area while not allocating any resources to the myriad grave housing issues.

32

102. The City of Milwaukee is required to routinely and consistently issues work orders to homes and buildings that are in noncompliance with applicable building codes.

103. The City of Milwaukee has issued Dieter and Schwenke several thousand dollars' worth of work orders to fix alleged building code issues on their respective properties.

104. The City of Milwaukee does not issue work orders for the majority of homes and buildings within the Near West Side (and other containment zones) because it is a containment zone and the City of Milwaukee wants to continue housing its low-income, disabled, and minority population within this area.

105. Deaths and serious bodily injuries have resulted from the City refusing to enforce building codes and address building code violations. The deaths and injuries are well documented and known to the City.

106. Containment zones within the City of Milwaukee contain substantially more building code violations related to electrical issues than non-containment zone areas. It has been estimated that approximately 80% of single- and two-family rental properties within the 53206 ZIP code (another containment zone) have electrical building code violations. Dieter and Schwenke assert that it is likely the Near West Side posts a similar statistic.

107. Dieter and Schwenke have observed the City providing false and misleading information during City Licensing Committee Hearings for the purpose of perpetuating the containment zone in the Near West Side.

   a. During Milwaukee Licensing Committee hearings, legal counsel for the Clark House rooming houses has maintained that the Clark House rooming houses provide space for people with disabilities. The City permitted the Clark House rooming houses to continue operating based in part on the representation that the

rooming houses provided space for people with disabilities. When challenged on the lack of handicapped accommodations and building code violations, the Clark House attorney indicated that the Clark House rooming houses were not "ADA" housing.

b. As noted above in paragraph 99(g)(xiv) and (xv), the City provided false and/or misleading information regarding the deadline for submission of objections and evidence opposing applications for rooming house licenses.

c. It is standard protocol at rooming house licensing hearing to ask a City of Milwaukee Police Representative (who is in attendance at the hearing) whether any police calls have been made to that property. The reason for this inquiry is to determine whether the property is or has been a problem from a crime standpoint. During the September 11, 2018 licensing hearing, the Milwaukee Police Department testified that there were no police reports for Clark House in the prior twelve (12) month period. (September 11, 2018 License Committee Hearing at time stamp 6:13:22). This was false. In reality, there were 125 calls for service at the Clark House rooming houses between September 2017 and July 2018. These calls were for a variety of issues including, but not limited to, shots fired, drug dealing, burglary, subject seen with a gun, etc. Multiple neighborhood residents were present at this licensing hearing and objected to the false report.

d. One-year later, on September 10, 2019 hearing, the Licensing Committee only allowed the Police Department to respond with incidents that rose to the level of a "License Premise Report." By doing so, the Licensing Committee disregarded a

34

substantial number of emergency calls from the prior 12 months including, but not limited to, the following:

    i.  The 2424 W Kilbourn property had the following police calls: 9/29/18, officers to battery complaint – assault by a person living in a unit at the Clark House; 3/15/19, officers flagged down at 2424 W Kilbourn. Individuals were not supposed to be at the rooming house but were loitering there. One suspect was arrested on a warrant;10/8/19, officer called to scene.

    ii.  The 933 N 24th St. property had the following police calls: 11/30/18, there was a mental health call, someone from the rooming house was considering suicide; 1/6/19, there was a mental health call, the police officer had to take the resident to a hospital for mental health treatment; 1/12/19, there was a mental health call, the responding officer took the resident to a veterans hospital; 1/17/19, there was a complaint about a fight on the property from a resident; 1/29/19 there was a mental health call, the officer took the resident to a veterans hospital; 3/13/19, officers went to a subject with weapon call, which turned out to be amental health complaint as well, the subject was taken to the hospital; 4/9/19, officers responded to a battery complaint, a physical altercation occurred when officers arrived; 4/29/19, there was a troubled subject complaint, the resident was being too loud late for multiple nights in a row; 5/4/19, armed robbery complaint; 5/5/19, there was a call for a mental health observation, caller was taken to hospital for mental health treatment;

5/22/19, there was a theft complaint by a known subject; 6/1/19, there was a check the welfare call, a tenant was calling to say he would turn in a drug dealer and was asking if he should tell the drug dealer first that he was turning him in; 6/2/19 there was a mental health evaluation, caller was taken to veterans hospital for mental health evaluation; 6/11/19 there was a battery complaint, caller was struck in the face by a resident of the Clark House, subject was arrested; 8/2/19, there was a troubled subject complaint; 8/5/19, there was a mental health evaluation call, caller said he saw someone who assaulted him in the area and was worried; 8/12/19, there was a mental health observation, caller was taken to Aurora Hospital for mental health treatment; 8/28/19, there was a mental health observation complaint, the resident was taken to the hospital for mental health treatment.

iii. The property at 939 N 24th St. had the following police calls: 1/1/19, there was a welfare check, officers took the resident caller to the hospital; 1/4/19, there was a subject with weapon complaint, the officers located the weapon; 4/14/19, there was an entry complaint, someone's storage unit items were missing from the basement of the property.

iv. The property at 947 N 24th St. had the following police calls: 11/30/18, there was a troubled subject call because there was a group of subjects in the property that were not supposed to be there; 1/5/19, there was a battery complaint, resident struck another resident; 7/8/19, there was a mental health observation complaint, the resident was very dehydrated and taken

36

to a hospital for medical treatment; 8/28/19, there was a troubled subject complaint, someone was kicking and pounding on the doors of the rooming house. (September 11, 2019 License Committee Meeting at time stamp 8:02:00).

e. During the same September 9, 2019 hearing the District 4 Alderman confirmed that over 400 calls to the police department were made to the Clark House rooming hoses between January 2015 and August 2019. Milwaukee Police Captain Jeffrey Norman confirmed that residents living near the Clark House properties have expressed frustration and concern with the amount of crime occurring at the Clark House properties.

f. During the July 14, 2020 haring on license for Clark House property 2424 W. Kilbourn Ave., the police report inexplicably indicated that there were zero calls to the police department over the prior 12-months. (July 14, 2020 Licensing Committee Hearing at time stamp 3:26:06). This is the same property that had 117 police calls during the previous 12-month period.

g. Dieter and Schwenke learned that in 2021 the Clark House owners placed signs within the rooming houses stating that the calls to fire and police departments would result in fines of $300 and $275, respectively. The signs further indicated that repeat violations of this rule would result in eviction. (Exhibit G)

h. Dieter and Schwenke have personally observed police calls being ignored or downgraded within the Near West Side.

i. Dieter and Schwenke have received confirmation from police officers stationed within the Near West Side that the Near West Side is a containment zone where the police are there to monitor rather than stop crime.

j. The City of Milwaukee has been disparately applying its licensing rules and guidelines to containment zones like the Near West Side for the sole purposes of perpetuating the containment zones. The City does not apply the same or remotely similar rules to non-containment zone licensing issues.

108.    Dieter has asked the City to declare the Clark House rooming houses as nuisances. Despite meeting the statutory definition for being considered a nuisance, the City has refused to declare the properties a nuisance. Dieter provided testimony and evidence at the September 11, 2018 Milwaukee Licensing Committee hearing indicating that he had witnessed drug and alcohol usage outside, prostitution, weapons, rude behavior, public urination, public sex, shooting of firearms, drug overdoses, and people living the rooming houses dying from overheating on the property. Dieter provided similar testimony at the July 14, 2020 Milwaukee Licensing Committee hearing. Bobby McQuay, Near West Side Partner, testified at the July 14, 2020 Milwaukee Licensing Committee hearing and agreed with the information presented by Dieter. Mr. McQuay further confirmed that the new owners of the Clark House properties had not improved the conditions of the property. (July 14, 2020 Licensing Committee Hearing at time stamp 4:05:50).

109.    A number of concerned neighborhood residents provided testimony to the Milwaukee Licensing Committee regarding the horrendous conduct occurring at the Clark House rooming houses. Barb Scotty, resident, reported that she has been solicited for drugs on numerous occasions while walking by the Clark House on her way to work. (September 10, 2019

Licensing Committee Hearing at time stamp 9:03:20). Darren Fields, resident, testified that a resident of the Clark House rooming houses came to his bedroom window at 3:00 a.m. naked and carrying an assault rifle. Mr. Fields also observed residents of the Clark House rooming houses throw old couches and other property onto his property. (July 14, 2020 Licensing Committee Hearing at time stamp 4:12:05). Chuck Schmitt, Near West Side property owner, presented the Milwaukee Licensing Committee with a petition signed by 42 neighborhood residents showing their disagreement with the City's failure to follow the Comprehensive Plan. Many other residents have provided similar testimony to the Milwaukee Licensing Committee regarding the Clark House rooming houses, yet the City still permits the rooming houses to operate illegally.

110.    In or around May 2020, Dieter spoke with a member of the City Attorney's Office to discuss having the Clark House rooming houses declared nuisances. The City Attorney's Office told Dieter that "85% of the properties in the Near West Side could be nuisanced."

111.    Dieter and Schwenke have observed the City refusing to enforce criminal laws within the Near West Side for the purpose of perpetuating the containment zone.

112.    Dieter and Schwenke have addressed some of their concerns with City of Milwaukee police officers who have confirmed that the Near West Side is a containment zone.

113.    Dieter and Schwenke have addressed some of their concerns with the District 4 Alderman for the City of Milwaukee who has confirmed that the City has refused to enforce building codes within the Near West Side for many years.

114.    Dieter and Schwenke have addressed serious ongoing safety concerns with the City of Milwaukee regarding unsafe structures within the Near West Side, but the City has refused to take any action regarding these structures for the purpose of perpetuating the containment zone.

115.    Dieter and Schwenke have affirmatively attempted to bring development into the Near West Side only to have such efforts cut short by the City and/or developers because of the ongoing nature of the containment zone.

116.    Dieter and Schwenke have provided the City of Milwaukee with pictures, videos, and reports demonstrating that various rooming houses and other structures within the Near West Side are unsafe for habitation and should be nuisance and/or razed. The City has ignored their complaints and the houses and structures continue to stand and be used to house low income residents.

117.    Dieter and Schwenke have provided the City with information showing that it has knowingly permitted rooming houses within the Near West Side to operate without valid licenses for multiple years. The City continues to allow the rooming houses to operate.

118.    The City of Milwaukee has permitted several rooming houses to operate within the Near West Side where the structures are unsafe and create a public nuisance.

119.    Dieter and Schwenke have observed serious sex offenders, many of them child sex offenders, being placed at the Clark House within feet of schools and day care facilities. Dieter and Schwenke have raised concerns regarding the placement of sex offenders in these locations but have been ignored by the City and County.

a.    Serious sex offenders are regularly placed in the Clark House rooming houses by and through the State of Wisconsin Department of Corrections (DOC) and various social service organizations. Placement of sex offenders at the Clark House by the DOC is supposed to be for emergency housing only, which is meant to last from 30 days to a maximum of 90 days. Dieter became aware of this fact through communications with Evan Goyke, State of Wisconsin Representative. (Exhibit

40

H, Email from Wisconsin State Representative, Evan Goyke). The Near West Side residents are rarely informed of a sex offender being placed in their neighborhood. On information and belief, many of the sex offenders placed at the Clark House are permitted to reside there longer than the 90-day "emergency" duration.

b. Serious child sex offenders and persons who have committed serious sex offenses have stringent limitations regarding their residential placement.

c. In January 2022 alone, there were nineteen (19) individuals listed on the sex offender registry living in Clark House rooming houses. Those individuals were convicted of the following offenses: 1st Degree Sexual Assault of a Child, 2nd Degree Sexual Assault of a Child, Rape, Possession of Child Pornography, Use of a Computer to Facilitate a Child Sex Crime, 1st Degree Sexual Assault, 3rd Degree Sexual Assault, and 4th Degree Sexual Assault.

d. There is a school of arts 1,000 feet from the Clark House; a Chinese school 1,000 feet from the Clark House; a daycare 500 feet from the Clark House; and City on the Hill after school programs 500 feet from the Clark House. (July 14, 2020 Licensing Committee Hearing at time stamp 3:46:24). On information and belief, placement of these sex offenders in the Clark House violates state and federal laws governing their residential placement. Exhibit I is a map of the Near West Side showing the location of sex offenders (red dots) and the location of schools (blue dots) as of January 2022. (Exhibit I)

e.  Neither the residents nor the schools or day care facilities located within the Near West Side are notified of the placement of child sex offenders within the neighborhood.

f.  The placement of convicted serious child sex offenders within the Clark House rooming houses is another example of the City's use of the Near West Side as a containment zone. The same serious child sex offenders would not be placed in non-containment zone areas within the City.

120.  The City of Milwaukee completely ignored and refused to affirmatively further the purposes of the FHA to overcome patterns of segregation, eliminate discrimination in housing, and foster a community that assists individuals of low to moderate income. Instead, the City has done the opposite. It has perpetuated segregation and discrimination in housing, discouraged economic development, underwritten blight and slums, and taken affirmative steps to ensure that the containment zone continues unabated.

121.  The City has treated the Near West Side and other containment zones within the City much differently than other neighborhoods within the City. The only difference between the neighborhoods is the color, income level, and disability status of its residents.

122.  The residents of the Near West Side are disparately impacted by the City's refusal to adhere to the mandates of the FHA and HUD.

123.  The City has violated the Comprehensive Plan, Consolidated Plans, and Annual Action Plans in its perpetuation of containment zones.

124.  The City has submitted false and misleading CAPERS to support its perpetuation of containment zones while keeping the line to federal funding open.

125.     People of color, those with disabilities, and low-income individuals are disparately impacted as a result of the City's unlawful actions.

126.     The City of Milwaukee has certified to the federal government that it is in compliance with federal anti-discrimination laws when receiving federal funds. The City's certification is false.

127.     The City of Milwaukee has certified to the federal government that it has affirmatively furthered the purposes of the FHA when receiving federal funds. The City's certification was false.

**LEGAL CLAIM**

128.     Defendants incorporate paragraphs 1 – 127 as if fully set forth herein.

129.     Defendants have created and maintained a containment zone in the City's Near West Side.

130.     Defendants have created and maintained containment zones in other areas of the City for the purpose of housing its low-income, disabled, and minority population.

131.     On information and belief, the City has created and maintained containment zones within the City of Milwaukee in areas heavily concentrated by slums, blight, individuals of low economic means, and disabled individuals.

132.     Each and every containment zone within the City of Milwaukee is comprised of slums, blight, individuals of low economic means, and disabled individuals.

133.     Within these containment zones, the City of Milwaukee refuses to enforce the anti-discrimination laws set forth in the FHA, Rehabilitation Act, and ADA for the purpose of maintaining and perpetuating the containment zones.

134. Within these containment zones, the City of Milwaukee refuses to enforce state and local building codes and ordinances for the purpose of maintaining and perpetuating the containment zones.

135. Within these containment zones, the City of Milwaukee ignores and/or refuses to enforce state and local laws and regulations pertaining to the licensure of rooming houses for the purpose of maintaining and perpetuating the containment zones.

136. Within these containment zones, the City of Milwaukee refuses to enforce criminal laws and ordinances for the purpose of maintaining and perpetuating the containment zones.

137. Within these containment zones, the City of Milwaukee refuses to enforce federal and state laws regulating the geographic restrictions in which convicted sex offenders may be placed for the purpose of maintaining and perpetuating the containment zones.

138. Within these containment zones, the City of Milwaukee refuses to affirmatively further the purposes of the FHA.

139. Each and every one of the aforementioned violations by the City of Milwaukee constitutes a violation of the FHA.

140. Many, if not all, of the aforementioned violations by the City of Milwaukee adversely impacts disabled individuals.

141. Many, if not all, of the aforementioned violations by the City of Milwaukee adversely impacts people of color.

142. Many, if not all, of the aforementioned violations by the City of Milwaukee adversely impacts the low-income population housed in these areas.

143. The City of Milwaukee, City of Milwaukee Community Grants Administration, Housing Authority of the City of Milwaukee, Milwaukee County, and Milwaukee County Health

44

and Human Services Housing Division certified to the federal government that they were in full compliance with the FHA, Rehabilitation Act, Title VIII of the Civil Rights Act of 1968, and ADA at all times during which it received federal funding. These certifications are false.

144.     On each occasion that the City made an express certification of the type described herein, the total number of which during the False Claims Period being not currently known to Relators, and on each occasion that the Defendants otherwise requested or demanded payment from the federal government based on the Defendants having supposedly complied with their certification-based obligations outlined above, they committed a separate violation of the False Claims Act, 31 U.S.C. § 379 et seq.

**PRAYER FOR RELIEF**

WHEREFORE, Relators pray for and judgment against the Defendants as follows:

1.  That the City of Milwaukee, City of Milwaukee Community Grants Administration, Housing Authority of the City of Milwaukee, Milwaukee County, and Milwaukee County Health and Human Services Housing Division cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.  That the City of Milwaukee, City of Milwaukee Community Grants Administration, Housing Authority of the City of Milwaukee, Milwaukee County, and Milwaukee County Health and Human Services Housing Division be required to pay the United States damages in the amount of three times the damages sustained by the United States because of the false claims alleged within the Complaint, as provided by the False Claims Act, 31 U.S.C. § 3729 et seq.;

3.  That civil penalties of $11,000 be imposed for each and every false claim that the City of Milwaukee, City of Milwaukee Community Grants Administration, Housing

45

Authority of the City of Milwaukee, Milwaukee County, and Milwaukee County Health and Human Services Housing Division presented to the United States;

4. That Relators be awarded the maximum share of the proceeds of the action or settlement of the claim, pursuant to 31 U.S.C. § 3730(d);

5. That Relators be awarded all costs of this action, including attorney's fees and expenses;

6. That pre and post judgment interest be awarded; and

7. That Relators be granted such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, RELATORS HEREBY DEMAND A TRIAL BY JURY.

DATED: FEBRUARY 25, 2022.

McDONALD & KLOTH, LLC
Attorneys for RELATORS


By:_____s/Shannon D. McDonald_____
Shannon D. McDonald
WI Bar No. 1036954

McDONALD & KLOTH, LLC
N96W18221 County Line Rd. #200
Menomonee Falls, WI 53051
262-252-9122 (Office)
262-252-9123 (Direct)
414-395-8773 (Fax)
sdm@themklaw.com