# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA *ex rel*. JAMES DIETER and KAREN SCHWENKE,

            Plaintiffs,

v.

CITY OF MILWAUKEE, CITY OF MILWAUKEE COMMUNITY DEVELOPMENT GRANTS ADMINISTRATION, HOUSING AUTHORITY OF THE CITY OF MILWAUKEE, MILWAUKEE COUNTY, and MILWAUKEE COUNTY HEALTH AND HUMAN SERVICES HOUSING DIVISION,

            Defendants.

Case No. 22-CV-240-JPS

**ORDER**

On February 25, 2022, Relators James Dieter ("Dieter") and Karen Schwenke ("Schwenke") (together, "Relators") brought this case under the False Claims Act, 31 U.S.C. § 3729 (the "FCA"). ECF No. 1. Relators allege unlawful receipt of federal funds through the submission of false certifications of compliance with federal, state, and local anti-discrimination and housing laws and ordinances, all in violation of the FCA. ECF Nos. 1, 34. After the parties met and conferred in accordance with the Court's pretrial order, ECF No. 16, Relators filed an amended complaint on October 21, 2022, which is the operative complaint in this action. ECF No. 34.

The case comes before the Court on (1) Defendants City of Milwaukee and City of Milwaukee Community Development Grants Administration's (together, the "City") motion to dismiss the amended complaint for failure to state a claim and motion to dismiss the amended complaint for lack of jurisdiction, ECF No. 37; (2) Defendant Housing Authority of the City of Milwaukee's ("HACM") motion to dismiss the amended complaint for failure to state a claim,[1] ECF No. 40; and (3) Defendants Milwaukee County (the "County," and together with the City and HACM, "Defendants") and Milwaukee County Health and Human Services Housing Division's ("HSHD")[2] motion to dismiss the amended complaint for failure to state a claim and motion to dismiss the amended complaint for lack of jurisdiction, ECF No. 45. All three motions are fully briefed, and the United States of America (the "United States") has separately filed a statement of interest related to the motions.[3] ECF Nos. 38, 41, 46, 49, 51, 52, 53, 54.

For the reasons stated herein, the Court denies the City's and the County's motions to dismiss the amended complaint for lack of jurisdiction. The Court grants the City's, HACM's, and the County's motions to dismiss

---

[1] HACM also moves to adopt and join the City's motion to dismiss. ECF No. 42. The Court will grant the joinder motion; the Court will consider HACM joined in the City's motion.

[2] HSHD will be dismissed from this action, as it is not a suable entity separate from the County; therefore, Relators' claims against HSHD "are effectively claims against the County." *Humphries v. Milwaukee County*, No. 10-CV-99-JPS, 2011 WL 5506676, at *5 n.4 (E.D. Wis. Nov. 10, 2011), *aff'd*, 702 F.3d 1003 (7th Cir. 2012).

[3] The United States declined to intervene in this action on August 1, 2022. ECF No. 9.

the amended complaint for failure to state a claim. The Court dismisses the amended complaint without prejudice, but affords Relators leave to amend.

## 1.    LEGAL STANDARD

### 1.1    Rule 12(b)(6) and Rule 9(b)

Federal Rule of Civil Procedure 12(b) provides for the dismissal of complaints which, among other things, "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (internal citation omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81. However, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citing *Twombly*, 550 U.S. at 555–56).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In other words, the plaintiff must set forth the "who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v.*

*Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)).

### 1.2    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a case where the Court lacks subject matter jurisdiction. When faced with a jurisdictional challenge, the Court accepts as true the well-pleaded factual allegations found in the complaint, drawing all reasonable inferences in favor of the plaintiff. *Ctr. For Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014).

### 2.    RELEVANT ALLEGATIONS

Defendants receive federal funding from, among others, the United States Department of Housing and Urban Development ("HUD"). ECF No. 1 at 7. From HUD, Defendants receive funds pursuant to four programs: the Community Development Block Grant ("CDBG"), the HOME Investment Partnership ("HOME"), the Emergency Shelter Grant ("ESG"), and Housing Opportunities for People with AIDS ("HOPWA"). *Id.* The City also receives funds from HUD through the Section 8 Housing Choice Voucher ("Section 8") program. *Id.*

As recipients of federal funds, Defendants are required to comply with Title VI of the Civil Rights Act ("Title VI"), Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act (the "ADA"). *Id.* at 9. HUD requires that fund recipients certify compliance with these laws. *Id.* In addition to certification of compliance, HUD ensures compliance by requiring recipients to submit plans such as the Consolidated Plan, the Annual Action Plan, and the Consolidated Annual Performance and Evaluation Report ("CAPERs"). *Id.* HUD also requires

fund recipients to certify that they will "affirmatively further the purposes" of the Fair Housing Act (the "FHA") (the "AFFH mandate"). *Id.* at 11.

Relators allege that the City has "found it much more profitable to create containment zones . . . in which to house the City's low-income population, minorities, disabled individuals, and criminals" while "devoting substantial resources to neighborhoods comprised of middle to upper income, non-minority, and non-disabled residents." *Id.* at 12. As a result, the City is one of the most segregated cities in the country. *Id.* at 13. The City has ignored HUD's mandate that the City "take intentional, affirmative steps to overcome patterns of segregation [and] eliminate discrimination in housing." *Id.*

To combat the worsening conditions in one neighborhood known as the Near West Side (the "NWS"), the City approved the Near West Side Comprehensive Plan (the "NWSCP") in 2004. *Id.* at 14. The NWSCP was developed using 2000 U.S. Census data. *Id.* at 17. The NWSCP's "residential goals" were to "strengthen and improve the existing neighborhood fabric" and to "increase owner-occupancy" in the NWS. *Id.*at 14. The NWSCP's "commercial goals" were to "create retail destinations that utilize existing commercial land and infrastructure" and to "enhance the marketability of commercial nodes to promote economic stability and growth." *Id.* The NWSCP's "institutions and public spaces" goals were to "increase sense of security" and to "enhance public destinations and gathering places for residents and visitors." *Id.* The NWSCP's "transportation goals" were to "recreate historic neighborhood traffic patterns to maximize route alternatives" and to "improve the viability of transportation alternatives." *Id.* at 15; *see also* ECF No. 1-2.

The NWSCP involved interviews with "stakeholders" of the NWS. ECF No. 34 at 15. Those interviewed believed it would be valuable to demolish buildings that are (1) without historic or architectural value, (2) deteriorated, (3) abandoned, or (4) sources of crime and drug abuse. *Id.* Over 79% of interviewees said that they wanted to see more home ownership in the NWS; 63.8% said that they wanted to see increased property maintenance and code enforcement in the NWS. *Id.* As a result, it was recommended that the City work towards more owner occupancy of single- and two-family homes in the NWS. *Id.*

The NWSCP also created focus groups for the stakeholders to suggest ideas for the City to bring the process to fruition, *id.* at 16, and community charrettes, where community members were encouraged to present evidence on issues, *id.* The NWSCP included land use policies to discourage community living arrangements. *Id.* It also levied a policy for developers to include architectural elements compatible with the character of the area, such as front porches, sidewalks, garages, windows facing the street, and well-lit entrances and walkways. *Id.* at 16–17. If a property had code violations or was deemed a nuisance property, the NSWCP instructed that a "spot acquisition" be used. *Id.* at 17.

Dieter purchased a residence in the NWS in 2004. *Id.* at 4, 21. The NWSCP was a key reason behind Dieter's decision to purchase his home. *Id.* Schwenke owns three residential investment properties in the NWS, which she purchased in 2004. *Id.* at 4, 21. Like Dieter, Schwenke's decision to purchase properties in the NWS was also based on the NWSCP. *Id.* at 4. Schwenke was aware that the bulk of funds used to rehabilitate the NWS would come from the federal government, which also led her to purchase the investment properties in the NWS. *Id.*

Relators allege that relatively little, if any, of the NWSCP has been implemented. *Id.* at 17. The 2000 U.S. Census data used to develop the NWSCP showed that the NWS had approximately twice the population density of other City neighborhoods; the same is true today. *Id.* Today, approximately 82% of the NWS is comprised of minorities. *Id.* Over 15% of the State of Wisconsin's homeless beds are in the NWS, which is a 2.6 square mile area of the City. *Id.* at 18. Of the 125 rooming houses within the City, which is 96.1 square miles, 54 rooming houses are in the NWS. *Id.* Nine rooming houses are within one-and-one-half blocks of Dieter's home. *Id.* Rooming houses are notorious as both symptoms and causes of neighborhood decay. *Id.* State and local ordinances support denial of a rooming house license where there is an oversaturation of rooming houses within a geographic area. *Id.*

Relators have observed that the City has "ignored federal laws regulating housing with respect to disabled individuals, ignored slum and blight conditions, ignored the adverse impact on people of color, ignored crime, ignored building code violations, and ignored zoning ordinances." *Id.* at 20. Because Relators have lived in the NWS since 2004, they have witnessed the NWS "become more blighted and segregated over the years despite the alleged influx of tens of millions of dollars." *Id.* at 21. They have also observed that the NWS is used as a containment zone for low-income, minority, and disabled individuals, and that the City has ignored the NWSCP, the Consolidated Plans, and the Annual Action Plans. *Id.* at 21–22.

HACM provides housing assistance for the elderly, persons with disabilities, and low-income families within the NWS and the City using subsidized public housing and Section 8. *Id.* at 19. HACM provides over 5,500 low-income households with Section 8 vouchers in the City. *Id.*

HACM owns nearly 1,000 buildings in the City that receive federally funded assistance. *Id.* In addition to certification of compliance with anti-discrimination laws and the AFFH mandate, HACM must certify that the buildings receiving Section 8 vouchers are safe. *Id.*

Relators have observed that many of the buildings receiving Section 8 vouchers in the NWS are not safe and do not comply with applicable housing codes and ordinances. *Id.* 19. Relators have observed that those most affected are disabled, minorities, and/or the elderly. *Id.*

Like HACM, the County provides housing assistance for the elderly, disabled, and low-income families within the NWS and the City using, among others, Section 8. *Id.* As with HACM, Relators have observed that many of the buildings and homes receiving Section 8 vouchers in the NWS are not safe and do not comply with applicable housing codes and ordinances. *Id.* 20. Relators have observed that those most affected by these practices are disabled, minorities, and/or the elderly. *Id.* Relators contend that the City and the County "have been made aware" that buildings receiving federal assistance through Section 8 are unsafe and noncompliant with building codes and ordinances. *Id.* Nonetheless, Relators maintain that they have personally observed the City refuse to enforce building codes in the NWS, while enforcing them outside of the NWS. *Id.* at 22.

Specific examples of the City's disparate treatment include the following. The DNS does not apply building codes and license requirements to rooming houses and other blighted buildings, despite confirmation at a City of Milwaukee Board of Zoning Committee Meeting that the DNS is required to do so. *Id.* at 22–23. Relators have submitted code violations to the City, which were confirmed by the Alderman for the Fourth District, but not addressed. *Id.* at 23. The Alderman also confirmed

that the rooming houses created blight in the NWS. *Id.* For example, just from Dieter's home, Dieter can see missing siding, holes in roofs, rotten steps and railings, and broken windows, which Dieter appears to have raised at a September 11, 2019 Licensing Committee Hearing. *Id.* On the rare occasion that the City issues a work order for a rooming house, Relators have observed that the order is not enforced. *Id.* The City has consistently ignored laws regarding the inapplicability of rooming house licenses where, among others, the neighborhood is oversaturated, police resources will be excessively expended, or there is mold or a fire hazard. *Id.* at 23–24.

One example of the City's alleged violations of "various licensing laws and zoning ordinances in its efforts to perpetuate the [NWS] containment zone" is the operation of the "Clark House" rooming houses. *Id.* at 24. The Clark House rooming houses are a set of five rooming houses in the NWS (all together, the "Clark House"). *Id.* The Clark House houses primarily low-income, disabled, and minority individuals. *Id.* Anthony Katchever ("Katchever") owned the Clark House until January 2020, at which time he sold the properties to ProBuColls Association ("ProBuColls"). *Id.* at 25. Katchever and ProBuColls both operate(d) the Clark House by accepting federal funding that has (or had) been distributed to the City and the County. *Id.* For example, the County used funds from the CDBG program in 2018 to fund 16 rooming house apartments by paying above average market rent for 15 years. *Id.*

Katchever's licenses for the Clark House were not transferred to ProBuColls with the sale. *Id.* DNS confirmed by letter in February 2020 to Dieter that the Clark House had been operating without valid licenses. *Id.*; ECF No. 1-4. DNS confirmed that the Clark House would continue to operate while the new owner applied for licenses. ECF No. 34 at 26. In the

same letter, DNS misrepresented that the Clark House was not subject to the zoning code unless "an intensification of the premises occurs." *Id.* However, the applicable Wisconsin code provision states that a change in zoning supports cancellation of a license. *Id.* (citation omitted). The Clark House had been rezoned in or around 2005, and the new zoning no longer permitted rooming houses. *Id.* at 26–27. While Katchever was "grandfathered" in despite the zoning change, the sale to ProBuColls removed that concession. *Id.* at 27.

During a July 2020 licensing meeting, Milwaukee Aldermen expressed frustration with the City for permitting the Clark House to operate without valid licenses. *Id.* At the same meeting, Dieter informed the City of the zoning changes. *Id.* Dieter also confirmed the lack of valid licenses. *Id.* At the meeting, the executive director for the NWS Partners testified that the NWS was oversaturated with rooming houses and low-income housing. *Id.* Regardless, the City permitted the Clark House to continue operating without valid licenses. *Id.*

In September 2020, the City renewed the licenses for the Clark House. *Id.* at 28. The City did not conduct a standard hearing process on the licenses. *Id.* In June 2021, Dieter contacted the City to inquire about the deadline to object to rooming house licenses. *Id.* Dieter submitted objections on July 13, 2021, which was the deadline he was told, and which he later found out was the same date as a hearing on the licenses. *Id.* Dieter attended the hearing, and observed the City instruct council members that they could not consider the information submitted by Dieter because it was untimely. *Id.* At the same hearing, a Milwaukee building and home inspector testified and submitted a 90-page report regarding building code violations at the Clark House. *Id.* at 29–32. The Clark House attorney has also testified before

the City that the Clark House was not "ADA" housing. *Id.* at 36. Nonetheless, the licenses were approved. *Id.* at 29. The City has now stopped inspecting the Clark House for building code violations. *Id.* at 32.

In contrast to the Clark House, Relators aver that the City has denied such licenses in non-containment zones. *Id.* at 33. For example, the City denied a license for an extended stay hotel near the Milwaukee airport after hearing testimony and concerns that the facility would create crime and blight. *Id.* The City also shut down a rooming house in a non-containment zone area after the DNS inspected it and found nine violations, including operation without a valid license. *Id.* Relators contend that these disparities are due to the City's intent to create containment zones. *Id.* at 34. By way of additional example, in May 2020, Relators allege that the DNS suspended monthly inspection programs for "700 chronically negligent properties in Milwaukee" despite lacking authority to do so. *Id.*

At other hearings regarding the Clark House, such as one in 2018, the Milwaukee Police Department (the "MPD") testified that there were no police reports for the Clark House in the prior 12-month period. *Id.* at 36. In reality, there had been 125 police calls for a variety of crimes. *Id.* At another hearing in 2019, the Licensing Committee asked the MPD to testify only regarding Clark House incidents rising to the level of "License Premise Report," which led to a substantial number of incidents being disregarded. *Id.* at 37. The Alderman confirmed that over 400 police calls to the Clark House were made in the preceding four years. *Id.* at 39. The next year, the police report indicated zero police calls to the Clark House in the preceding year. *Id.* In 2021, Relators learned that the Clark House had erected signs stating that calls to fire and police departments would result in fines or evictions. *Id.* Relators have observed police calls ignored or downgraded

and have learned from police officers near the NWS that it is a containment zone, where police are to monitor rather than stop crime. *Id.* at 40.

At all of these hearings, Dieter and other NWS residents testified that the Clark House is a nuisance, and described a variety of criminal conduct that occurred there. *Id.* at 40–41. At one point, Dieter spoke with a member of the City Attorney's Office, who informed Dieter that "85% of the properties in the [NWS] could be nuisanced." *Id.* at 41. Ostensibly, they have not been nuisanced, in contravention of the NWSCP's "spot acquisition" plan. Relators also allege that sex offenders, including child sex offenders, have been placed at the Clark House "within feet of schools and day care facilities." *Id.* at 42. Dieter learned that sex offenders are to be placed in the Clark House on an emergency basis meant only to last 30 to 90 days. *Id.* at 42–43. However, sex offenders are often permitted to stay at the Clark House longer than 90 days. *Id.* at 43. Relators have raised these concerns, but have been ignored by the City and the County. *Id.* Relators aver that sex offenders are not placed in non-containment zones. *Id.* at 44.

Because the City has created containment zones, refused to enforce criminal laws in the containment zones, and refused to enforce building codes in the containment zones, Relators allege that death and serious injury—both known to the City—have occurred. *Id.* at 35, 41. By engaging in this conduct, Relators contend that the City has "refused to affirmatively further the purposes of the FHA to overcome patterns of segregation, eliminate discrimination in housing, and foster a community that assists individuals of low to moderate income." *Id.* "Instead, the City has done the opposite." *Id.* According to Relators, to further this agenda, the City has violated the HUD's requirements with respect to the Consolidated and Annual Action Plans, and submitted false and misleading CAPERs. *Id.* at

44. The City has also falsely certified compliance with federal anti-discrimination laws and falsely certified to the AFFH mandate. *Id.* at 45.

### 3.    ANALYSIS[4]

#### 3.1    Public Disclosure Bar

Defendants submit their motions to dismiss as to the public disclosure bar under both Rule 12(b)(1) and Rule 12(b)(6). ECF No. 39 at 1. The Court addresses it first as a potential bar to the Court's jurisdiction. The FCA provides that "[t]he court shall dismiss an action or claim . . . if substantially the same allegations or transactions were publicly disclosed" in one of three venues: (1) "a Federal, civil or administrative hearing in which the Government or its agent is a party"; (2) "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (3) "from the news media." 31 U.S.C. § 3729(e)(4)(A).

"Determining whether to apply the public disclosure bar requires the court to complete a three-step inquiry." *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 690 (7th Cir. 2014). "First, it examines whether the relator's allegations have been publicly disclosed. If so, it next asks whether the lawsuit is based upon those publicly disclosed allegations. If it is, the court determines whether the relator is an original source of the information upon which his lawsuit is based." *Id.*

This case is much like *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999). There, as Defendants argue is the case here, "all the facts on which [the relator] based his fraud claim were publicly

---

[4]The parties' briefing often cited many more than 10 cases per issue and was rife with string citations. The Court warned the parties of its preferences against overuse of both of these practices in its pretrial order. ECF No. 16 at 4. In the future, the parties should take care to conform with the Court's preferences.

Case 2:22-cv-00240-JPS   Filed 04/10/23   Page 13 of 36   Document 55

disclosed." *Id.* at 1017. Nonetheless, the Seventh Circuit ultimately held that the public disclosure bar did not apply. *Id.* at 1018. The Seventh Circuit first noted that the relator "cannot be the original source of the allegedly false statements made by the City in its grant applications" because "[t]hose statements were submitted directly to the FTA, and [the relator] only learned of them following his request under the Freedom of Information Act." *Id.* However, next, the Seventh Circuit concluded that the relator nonetheless had "direct and independent knowledge of information on which his fraud allegations are based." *Id.* The relator had direct knowledge because he observed the way the City of Green Bay implemented its programming firsthand. *Id.* Although the relator was "a bit of a busybody with his own agenda" during his walkabout investigations, he had independent knowledge because he was still providing "independent efforts [that] assist the government in ferreting out fraud." *Id.* at 1018.

Similarly, here, Relators are certainly not the original source of the allegedly false statements in the plans and reports submitted to the government. *See also United States ex rel. Yannacopolous v. Gen. Dynamics*, 315 F. Supp. 2d 939, 951 (N.D. Ill. 2004) (public records are not "public disclosures" and even if the initial terms are disclosed, "without the relator's allegations of subsequent fraud, one cannot reasonably infer" an FCA violation). However, the amended complaint alleges myriad examples of Relators' direct and independent personal observations of Defendants' alleged violations. Despite Defendants' protests to the contrary, Relators avoid the public disclosure bar, and the Court "ha[s] jurisdiction to entertain [their] claim." *Lamers*, 168 F.3d at 1018.

### 3.2  Elements of Relators' Claims

Relators plead their FCA claim under 31 U.S.C. §§ 3729(a)(1)(A) & (B). ECF No. 34 at 2.[5]  These sections "impose liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778 (7th Cir. 2016) (quoting 31 U.S.C. §§ 3729(a)(1)(A) & (B)). To state such a claim, Relators must show "(1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Id.* As a fourth element, Relators must show "that the government actually attaches weight to the [condition for payment] and relies on compliance with it." *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 740 (7th Cir. 2021).

"Because it is an anti-fraud statute, claims under the FCA" are subject to the Rule 9(b) heightened pleading standard. *Id.* Thus, Relators must plead the "who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42.

#### 3.2.1  Falsity

The City[6] argues that Relators' claim fails primarily on the second element: falsity. The City identifies three deficiencies in Relators' pleading

---

[5] The City states that it lacks notice of which FCA provisions are at issue here, but the amended complaint cites to specific provisions, as do the parties' proposed jury instructions. ECF No. 38 at 10; ECF No. 34 at 2; ECF No. 43.

[6] On the defense side, the citations to briefing and argument summaries in this section largely derive from the City's briefing, ECF Nos. 38, 53. As the Court explains *infra* Section 3.3, the amended complaint does not adequately plead with specificity as against HACM and the County. However, to the extent applicable,

Case 2:22-cv-00240-JPS   Filed 04/10/23   Page 15 of 36   Document 55

of this element: (1) Relators have not identified any specific claims for payment that the City submitted to HUD; (2) Relators have not identified what specific requirements the City violated; and (3) Relators have not explained how the City's (in)actions violated those requirements. ECF No. 38 at 11. The Court takes up each argument in turn.

### 3.2.1.1 Claims for Payment

The City contends that the amended complaint lacks sufficient information to discern "what occurred at the individualized transactional level" in accordance with Rule 9(b). *Lanahan v. County of Cook*, 41 F.4th 854, 862 (7th Cir. 2022). Specifically, Relators do not allege *who* made the false claims for payment to HUD, *when* the claims were made, or *where* they were made. ECF No. 38 at 10–11.

At the outset, the Court agrees with the position advanced by the United States that, at the pleadings stage, the "who" required by Rule 9(b) may be the organization as a collective, rather than an individual actor. *See infra* Section 3.2.2.

Relators list the documents used to submit claims as the Consolidated Plans, the Annual Action Plans, and the CAPERs. Apart from the fact that certain of these documents are ostensibly submitted to HUD annually (as derived from their names), Relators do not list when they were submitted. With respect to where the claims were made, which is more properly described as the method of transmitting the claims, Relators list the specific programs within HUD that the City allegedly targeted for funds: CDBG, HOME, ESG, HOPWA, and Section 8.

---

the analysis in this section also applies to HACM and the County. HACM has joined the City's motion, and portions of HACM's and the County's briefing as to Rule 9(b) mirror the City's. ECF Nos. 41, 42, 46, 52, 53.

With similar underlying facts to those at bar regarding both timing and the method of transmission, the Central District of California held that the requisites of Rule 9(b) were met. *United States ex rel. Mei Ling v. City of Los Angeles*, No. CV 11-974 PSG (JCX), 2018 WL 3814498, at *6 (C.D. Cal. July 25, 2018) (explaining that, among others, "claims for payment in the form of annual funding agreements" were "specific allegations of false claims submitted to the Government," which "coupled with allegations of regulatory noncompliance, are sufficient to give Defendants notice of the misconduct alleged").

However, in a second case with nearly identical underlying facts to those at bar regarding both timing and the method of transmission, the Seventh Circuit held that allegations such as those Relators raise are insufficient to meet the Rule 9(b) standard. *See Hanna*, 834 F.3d at 781 ("Beyond the fact that the certifications were made yearly, 'typically in December,' Hanna says nothing more about timing. Nor does he allege the place, either the physical location *or the specific documents*.") (emphasis added). In his amended complaint, the *Hanna* relator, as Relators here do, raised the HUD Consolidated Plans (though the *Hanna* relator provided specific years for the plans). *Compare* First Amended Complaint, *United States ex rel. Hanna v. City of Chicago*, 11-CV-4885, ECF No. 54 (N.D. Ill. Nov. 3, 2014), at 4 & 13–14, *with* ECF No. 34 at 9. The *Hanna* relator also pleaded that the City of Chicago targeted many of the same programs raised here: CDBG, HOME, ESG, and HOPWA. *Compare* First Amended Complaint, *United States ex rel. Hanna v. City of Chicago*, 11-CV-4885, ECF No. 54 (N.D. Ill. Nov. 3, 2014), at 4, *with* ECF No. 34 at 7.

Seventh Circuit authority is binding on the Court, and the Court is therefore constrained to follow *Hanna*. If identical allegations were

insufficient there, they must be insufficient here. However, the Court believes the deficiencies are remediable.[7] Merely because Relators have not pleaded these facts does not necessarily mean that "there are no [such] facts" in existence to support their claim. 3 MOORE'S FEDERAL PRACTICE – CIVIL § 15.15.

As Relators argue, in this vein, and countering *Hanna*, is *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. 2016). There, only nine days after issuing the *Hanna* opinion, the Seventh Circuit held that Circuit case law "establishes that a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government" under certain circumstances. *Id.* at 777–78. One such circumstance is where the relator alleges personal knowledge that the defendant's conduct does meet the certification prescribed by the United States. *Id.* In another, an employee of a private institution adequately pleaded fraud under Rule 9(b) by alleging that "the institution failed to comply with federal law, received funding, and could only have received funding by certifying compliance with federal law.'" *Id.* at 778 (internal citations omitted). In both situations, the Seventh Circuit concluded that "the alleged facts necessarily led one to the conclusion that the defendant had presented claims to the government." *Id.* at 778.

The Seventh Circuit is clear that a specific document need not be pleaded or produced. However, there must be some factor that compelled the Seventh Circuit to reach a different conclusion in *Hanna* than in *Acacia*.

---

[7] Indeed, the district court in *Hanna* afforded the relators leave to amend before ultimately dismissing the case. *See generally United States ex rel. Hanna v. City of Chicago*, No. 11-CV-04885, 2014 WL 12933553 (N.D. Ill. Sept. 25, 2014).

Case 2:22-cv-00240-JPS   Filed 04/10/23   Page 18 of 36   Document 55

The City urges the Court to hold that the difference between *Hanna* and *Acacia* is that *Hanna* involves a public entity defendant—the City of Chicago—and, therefore, "the documents in question are probably publicly accessible." *Hanna*, 836 F.3d at 780. The Court does not believe that this is the distinguishing factor. In every FCA case, the relevant documents could be obtained through a public records request to, at a minimum, the federal government. But we know from the case law that this is not required. *Acacia*, 836 F.3d at 777–78; *see also Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 839 (7th Cir. 2013) (holding, in suit against private defendant, that relator need not refer to or produce specific documents that defendant submitted to government because "relator is unlikely to have those documents unless he works in the defendant's accounting department [and] holding otherwise would have taken a big bite out of qui tam litigation") (internal citations omitted).

The Court reconciles the discrepancy by turning to the Seventh Circuit's conclusion in *Acacia*: the facts in the cited cases created an inference that the defendant had presented claims to the government. *Acacia*, 836 F.3d at 778. It follows, therefore, that in *Hanna*, they did not. By way of additional example, in *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, the Seventh Circuit held that pleading a list of "various forms, written reports and study results" was insufficient under Rule 9(b). 415 F.3d 601, 604 (7th Cir. 2005). The relators provided "no specifics about how the . . . funds were paid—whether in a lump sum . . . or periodically" and "shed no light on the nature or content of the individual forms or why any particular false statement would have caused the government to keep the funding spigot open." *Id.* at 605. *Gross* appears to be the missing link: while Relators need not produce or allege specific documents, they must

provide sufficient detail regarding the documents' contents such that the City and the Court can discern some particular false statement(s). As currently pleaded, Relators do not do so, and the amended complaint will be dismissed without prejudice on this basis.

However, the Court will permit Relators to amend the amended complaint to plead the "when" and "where" allegations as to the specific claims for payment, in accordance with *Gross*. To the extent this information is not available to Relators, they may plead these facts "on information and belief" so long as they also plead that "(1) the facts constituting the fraud are not accessible to [Relators] and (2) . . . . the grounds for [Relators'] suspicions." *Pirelli*, 631 F.3d at 443. If they do so, Relators should take into consideration that whether information is "a matter of public record" is a salient factor in the accessibility analysis. *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir. 1992). Indeed, Relators acknowledge in the amended complaint that, at a minimum, the CAPERs are available online on the City's website. ECF No. 34 at 9. The City submits that the Annual Action Plans and Consolidated Plans are available online on HUD's website. ECF No. 38-2 at 1–2.

### 3.2.1.2    Identification of Legal Standards

Similarly, the City argues that *Hanna* teaches that to plead the "what" portion of the falsity element where "the allegedly false certification relates to a failure to comply with certain statutory and regulatory provisions," Relators must present more than "an undifferentiated raft of statutory and regulatory provisions." *Hanna*, 834 F.3d at 779; *see also* ECF No. 38 at 13. In *Hanna*, the relator broadly alleged false certifications related to the City of Chicago's failure to comply with "Title VI, 42 U.S.C. § 2000d, et seq. and implementing regulations at 24 C.F.R. Part 1," "the Fair Housing

Act, 42 U.S.C. § 3601, et seq., and its implementing regulations at 24 C.F.R. Part 100," and "42 U.S.C. §§ 608(e)(5), 5304(b)(2), and 12705(b)(15) and applicable HUD regulations." *Id.* at 777.

Like Relators, the *Hanna* relator alleged that the City of Chicago falsely certified compliance with Title VI and falsely certified to the AFFH mandate. *See* First Amended Complaint, *United States ex rel. Hanna v. City of Chicago*, 11-CV-4885, ECF No. 54 (N.D. Ill. Nov. 3, 2014), at 1. In addition, the *Hanna* relator defined the AFFH mandate with citations to HUD authority, like Relators here do. *Compare* First Amended Complaint, *United States ex rel. Hanna v. City of Chicago*, 11-CV-4885, ECF No. 54 (N.D. Ill. Nov. 3, 2014), at 6, *with* ECF No. 34 at 10.

As with the "when" and "where" requisites of Rule 9(b), the Court is again constrained to follow *Hanna*. Relators here plead with no additional particularity than the relator did in *Hanna* (and arguably with less, as they do not cite any implementing regulations); therefore, the allegations here must also be insufficient. The Seventh Circuit explained in *Hanna* that Rule 9(b) demands identification of falsely certified compliance with "specific provision[s]" of the statutes and regulations at play as well as that the relator "draw a link between the statutes [he] is . . . citing and any particular alleged false certification." *Hanna*, 834 F.3d at 779. The City must be apprised of which specific statutory and regulatory provisions it is alleged to have violated to defend against the suit; further, the Court must know what those provisions are in order to have a metric against which to measure the factual allegations in light of the applicability of Rule 9(b).

Parenthetically, and with respect to how certain statutory and regulatory provisions may later be pleaded, the Court agrees with the United States that the City incorrectly refers to Title VI as prohibiting only

Case 2:22-cv-00240-JPS   Filed 04/10/23   Page 21 of 36   Document 55

intentional discrimination. ECF No. 51 at 14; *see also* ECF No. 38 at 14 (City brief). As the authority cited by the City demonstrates, the U.S. Supreme Court continues to uphold disparate impact agency regulations promulgated under Title VI. *See Alexander v. Sandoval*, 532 U.S. 275, 283 (2001). Applicable here, as the United States notes, HUD has promulgated such regulations. *See, e.g.*, 24 C.F.R. § 1.4(b)(2)(i); *see also* ECF No. 38 at 14 (City brief conceding the same).

The Court further agrees with the City that pleading the AFFH mandate with citations to HUD authority, in light of *Hanna*, is insufficient to plead "what" AFFH obligation(s) the City violated. ECF No. 38 at 15. Agency guidance, unless (1) supported by authority indicating that such guidance has the force of law or (2) sufficiently specific, is an insufficient basis for an FCA claim. *See United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 379 (5th Cir. 2017) (explaining that citations to "statutes, regulations, or caselaw" showing that a certain definition of an obligation has the force of law is sufficient basis for FCA claim); *see also United States v. Supervalu Inc.*, 9 F.4th 455, 471 (7th Cir. 2021) (agency manual "was not sufficiently specific" to warn defendant of prohibited conduct under the law). Therefore, Relators' current pleading of the AFFH mandate by citing to the HUD website is insufficient, and the amended complaint will also be dismissed without prejudice on this basis. ECF No. 34 at 10.

However, the Court, having reviewed the City's and the United States's differing explanations of the "shifting regulatory framework behind the AFFH certification requirement," does not find an irremediable pleading deficiency. ECF No. 38 at 15; *see also* ECF No. 51 at 11. Relators may amend their pleading on the issue of defining the AFFH mandate. The

Court explains why, in order to dispel confusion on the issue as Relators work on a second amended complaint.

The FHA contains a statutory AFFH mandate. 42 U.S.C. § 3608(e)(5) (HUD shall "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter"). Later-enacted, program-specific statutes, such as CDBG, HOME, and HOPWA, impose their own AFFH mandate and certification requirements, which are independent of the FHA AFFH mandate. *See, e.g.*, 42 U.S.C. § 5304(b)(2).

As both the City and the United States note, in July 2015, HUD issued a regulation defining "AFFH" and the certification requirement for program participants for the first time. 80 Fed. Reg. 42272, 42316 (July 16, 2015) (AFFH certification means the recipient "will take meaningful actions to further the goals identified in the AFH . . . and that it will take no action that is materially inconsistent with its obligation to [AFFH]") (the "2015 Rule"). In 2018, a planning requirement imposed in the 2015 Rule was paused without being reinstated. 83 Fed. Reg. 23927 (May 23, 2018) (the "2018 Rule"). Two years later, HUD rescinded the 2015 Rule and loosened the certification requirement such that "[a] HUD program participant's certification that it will affirmatively further fair housing is sufficient if the participant takes, in the relevant period, any action that is rationally related to promoting one or more attributes of fair housing [as defined]." 85 Fed. Reg. 47899, 47905 (Aug. 7, 2020) (the "2020 Rule").

One year later, HUD restored the 2015 Rule. 86 Fed. Reg. 30779, 30781 (June 10, 2021) (case law holding that "the AFFH obligation requires HUD and recipients of its funding to take proactive steps . . . beyond merely refraining from discrimination" "cannot be reconciled with [the 2020

Rule's] far more limited definition of affirmatively furthering fair housing, which a funding recipient satisfies by taking any step rationally related to any of a large set of objectives") (the "2021 Rule"). Recently, in a proposed 2023 rule, HUD called the 2020 Rule "a substantial and substantive departure from decades of judicial and administrative precedent interpreting the AFFH mandate." 88 Fed. Reg. 8516, 8524 (Feb. 9, 2023) (the "2023 Proposed Rule").

These changes encompass the timeframe pleaded in the amended complaint. Despite these changes, a program participant's duty to certify compliance to HUD remained. The City highlights the fact that the 2015 Rule referred to itself as a "planning rule," but then notes that such planning was short-lived, especially in light of the 2018 Rule having paused a planning requirement. ECF No. 38 at 17 (quoting 80 Fed. Reg. 42272 at 42313). And, as the City comments in the next breath, the 2021 Rule has not reinstated that planning requirement. *Id.* at 18. As the United States contends, with which the Court agrees, this is because the AFFH mandate is not merely a "planning process." ECF No. 38 at 19 (City brief referring to AFFH mandate as "principally . . . planning processes"); *see also* ECF No. 51 at 8 (United States's argument that AFFH mandate is not limited to planning).

In the 2021 Rule, HUD cites Circuit authority holding that the underlying AFFH mandate in the FHA extends to program participants as well, who must take "[a]ction . . . to fulfill, as much as possible, the goal of open, integrated residential housing pattens and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the [FHA] was designed to combat." 86 Fed. Reg. 30779 at 30787 (quoting *Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973)); *see also*

*N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 156 (1st Cir. 1987) (holding that, if HUD is engaging in its duties "in any meaningful way, one would expect to see, over time . . . HUD activity that tends to increase, or at least that does not significantly diminish, the supply of open housing").

While some program-specific statutes impose planning obligations, the underlying substance of and requirement for HUD program participants to comply with the AFFH mandate in the FHA always remains. And, with respect to many programs, substantive requirements are imposed alongside planning requirements. *See, e.g.*, 24 C.F.R. § 93.251(a)– (b) (HOME program requirements)). Moreover, courts considering nearly identical claims have rejected the notion that "certification to AFFH is prospective in nature"—even though programs (specifically, CDBG) include prospective language—because of the underlying "implied false certifications" in connection with the FHA. *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester County, N.Y.*, 668 F. Supp. 2d 548, 566 (S.D.N.Y. 2009); *see also Mei Ling*, 2018 WL 3814498, at *6– 7 (agreeing that, with each request for funds, the defendant City of Los Angeles "did not merely request payment, but also necessarily and impliedly made representations" about compliance). Indeed, the HUD-required CAPERs are specifically retroactive and instruct applicants to list "actions taken to affirmatively further fair housing." 24 C.F.R. § 91.520.

Therefore, contrary to the City's assertion that Relators' failure to plead the standard is "fatal" because the standard and the City's obligations thereunder changed, these issues are easily remediable. ECF No. 38 at 15. First, as the United States argues, the City draws no connection between the changes in planning requirements and any changes in certifications or substantive obligations under the FHA as a whole, or any of the specific

programs cited by Relators. While the required planning may have changed, the fact that the City had substantive obligations (with which obligations they were required to certify compliance) at all times did not.

Second, as the United States notes, the 2020 Rule defined "affirmatively further" and "fair housing"—which are referenced in that definition's certification requirement—only with respect to certain program statutes and regulatory planning requirements, not to the FHA AFFH mandate. ECF No. 51 at 12 n.6; *see also* 85 Fed. Reg. 47899 at 47905. Some of the cited statutes are programs pleaded by Relators; others are not. 85 Fed. Reg. 47899 at 47905 (citing, among others, 42 U.S.C. §§ 12705(b)(15) (HOME), 12903(c)(2)(A)(ii), 3(A)(i) (HOPWA)). Thus, even considering the change in the 2020 Rule, the underlying obligation in the FHA did not change.

Consequently, in accordance with the Court's holdings in this section, Relators may further amend their pleading to (1) identify which specific statutory and regulatory provisions the City is alleged to have violated and (2) identify which AFFH mandate applied at which times, and to which programs.

### 3.2.1.3   How Legal Standards Were Violated

Next, the City argues that Relators fail to allege "how" it has violated the law such that its certifications are false. ECF No. 38 at 19. The City takes specific issue with Relators' pleading as to the AFFH mandate certifications and the allegations that the City created containment zones.

With respect to the AFFH mandate certifications, the City contends that, even if Relators plead which version of the AFFH mandate is at issue at which time, dismissal is still required because Relators have not pleaded that the City violated any version. *Id.* The City first supports this argument

Case 2:22-cv-00240-JPS   Filed 04/10/23   Page 26 of 36   Document 55

with a variation on its argument, discussed above, that the AFFH mandate requires principally planning. *Id.* For the reasons explained above, the Court concurs with the United States that the AFFH mandate requires more than planning. The Court therefore rejects the City's assertion that its certifications could not be false because all it was certifying is that it had planned. *Id.* at 19 & n. 11.

Second, the City argues that Relators fail to identify which Consolidated Plans, Annual Action Plans, and CAPERs the City violated, and argue that the NWSCP is irrelevant because it has nothing to do with HUD funding. *Id.* at 20. The Court has already addressed the first issue and concluded that it is remediable. *See supra* Section 3.2.1.2. As to the NWSCP, Relators do not plead that the City submitted the NWSCP to HUD or certified compliance with the NWSCP to HUD. In the Court's view, the NWSCP is pleaded as an example of why the certifications are false. In other words, Relators allege that the NWSCP has created a situation that does not comply with federal anti-discrimination laws and that does not affirmatively further fair housing. While the NWSCP and its effects are in existence, certifying compliance with these requirements is allegedly a false certification. At a minimum, Relators need not amend their pleading to remove allegations regarding the NWSCP.

The City also asserts that Relators have not plausibly alleged that the City maintained containment zones. ECF No. 38 at 21. First, the City argues that Relators' pleading is "backward-looking" because they allege that the City "ha[s] not complied" with HUD's requirements, instead of raising "forward-looking" allegations. *Id.* at 15. Such "forward-looking" allegations should plead that the City "*intended* not to fulfill [its] commitment under any alleged certifications." *Id.* (emphasis added). The

"backward-looking" argument is another variation on the planning argument the Court has already rejected, and the Court will take up scienter in the next section. *See infra* Section 3.2.2.

With respect to the containment zone allegations, second, the City claims that Relators' allegations "simply fail the plausibility test." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). The Court concurs that conclusory allegations, such as "Defendants consistently and repeatedly ignored federal laws prohibiting discrimination," are insufficient. *Id.* (quoting ECF No. 34 at 3–4). However, the Court earlier concluded that Relators may amend their amended complaint to cite the specific statutory and regulatory provisions the City is alleged to have violated. *See supra* Section 3.2.1.2. The City also asserts that Relators allege only "a few isolated instances of misconduct" instead of a pattern. ECF No. 38 at 23. The Court disagrees. Should Relators adequately tie all of the instances of alleged misconduct they have raised to specific statutory or regulatory provisions, they will have pleaded sufficient examples of misconduct to suggest a pattern.

The City next argues that Relators' allegations regarding the containment zones are implausible "given more likely explanations," such as "multiple, complex causes that are common to major cities." *Id.* (quoting *Iqbal*, 556 U.S. at 681). Notwithstanding that the City provides no more specificity as to the "multiple, complex causes" than they allege Relators do in their amended complaint, "[t]he plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. "[I]t is not . . . necessary (or appropriate) to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Alexander v. United States*, 721 F.3d 418, 422 (7th Cir.

2013) (citing *Iqbal*, 556 U.S. at 678) (internal citations omitted). "Rather, the plausibility requirement demands only that a plaintiff provide sufficient detail to present a story that holds together." *Id.* (internal citations omitted). The Court will therefore decline the City's invitation to weigh its proffered competing inferences.

Similarly, because the Court has already concluded that it will dismiss the amended complaint without prejudice but with leave to amend, the Court will not wade into the examples the City raises of inaccuracies in the facts. ECF No. 38 at 24–27. The City urges the Court to deny Relators the presumption of truth because some allegations are inconsistent with transcripts from hearings and other "judicially-noticeable records." *Id.* While the Court will take judicial notice of the cited transcripts and public records, it will not conclude that the amended complaint "cannot satisfy the 12(b)(6) standard" at this juncture. *Murphy v. United Parcel Serv., Inc.*, 528 F. Supp. 3d 983, 986 (E.D. Wis. 2021). Relators, as officers of the Court, should carefully review their amended complaint and ensure that each and every allegation is accurate in any second amended complaint. Should the allegations in any second amended complaint continue to be demonstrably inaccurate by an undisputed matter of public record, the Court will entertain a renewed request for dismissal on this issue.

### 3.2.2  Scienter

In addition to falsity, the City argues that Relators' amended complaint fails on the second element of an FCA claim: that "the statement was false." *Hanna*, 834 F.3d at 778. In other words, to state an FCA claim, the maker of a statement must know the statement is false. *United States ex rel. Yannacopolous v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011).

The City primarily contends that Relators fail to identify specific individuals who created and submitted the certifications, much less that these individuals "knew at the time that the City did not intend to live up to them." *United States ex rel. Hanna v. City of Chicago*, No. 11-CV-4885, 2015 WL 5461664, at *2 (N.D. Ill. Sept. 16, 2015). The City firmly maintains that collective or organizational scienter, such as allegations of knowledge by the City versus a specific individual, does not support an FCA claim. ECF No. 38 at 28.

However, as the United States notes, in affirming *Hanna*, the Seventh Circuit nowhere held that collective scienter was forbidden. Indeed, the Seventh Circuit's opinion appears to support collective scienter. *Hanna*, 834 F.3d at 779 ("Note that we are not saying that plaintiffs in Hanna's position must list *the City's promises* with any more particularity than that with which *the City made them*.") (emphases added). Elsewhere, the Seventh Circuit has repeatedly confirmed in dicta that it recognizes collective scienter in FCA cases. *See, e.g., Lanahan*, 41 F.4th at 865 ("Relator fails to plead any facts suggesting *Cook County knew* it was in possession of government funds to which it was not entitled."); *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1108 (7th Cir. 2014) (complaint did not adequately plead that "*the pharmacy* [acted] with the intention of defrauding the government"); *Lamers*, 168 F.3d at 1017 (analyzing "*the City's statements*" under the scienter standard) (emphases added to all).

The FCA itself defines "knowing" and "knowingly" as (1) having "actual knowledge of the information," and (2) acting "in deliberate ignorance of the truth or falsity of the information" or (3) acting "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). Even the D.C. Circuit case upon which the City relies explains that "if a

plaintiff can prove that a government contractor's structure prevented it from learning facts that made its claims for payment false, then the plaintiff may establish that the *company* acted in deliberate ignorance or reckless disregard of the truth of its claims." *United States v. Sci. Applications Intern. Corp.*, 626 F.3d 1257, 1276 (D.C. Cir. 2010) (emphasis added). The City further cites only one Seventh Circuit case where reference is made to an individual "who wrote grant applications" rather than the organization when analyzing scienter. *United States ex rel. Hill v. City of Chicago*, 772 F.3d 455, 456 (7th Cir. 2014). Also relevant is that, at the pleadings stage, Rule 9(b) requires only that intent be alleged "generally."

With this case law, the Federal Rules, and the statute in mind, the Court concludes that either individual or collective scienter may support an FCA claim. As the *Mei Ling* court held, allegations regarding "specific programs to which the City submitted allegedly false claims, specific applications that were submitted, specific requests for funding, and specific failures of the City to implement the requirements of federal accessibility laws" are sufficient to transform a pattern into "a plausible scheme that satisfies the scienter requirement." 2018 WL 3814498, at *11; *see also United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018) (holding that "[t]ripping up on a regulatory complexity does not entail a knowingly false representation" while alleging "particularities of the fraud scheme" may) (citations omitted). The Court has already raised deficiencies with these enumerated items, and accordingly dismissed the amended complaint with leave to amend.

Additionally, with respect to scienter, the City again raises that Relators fail to allege sufficient actions to support a pattern. *See* ECF No. 38 at 29 (referring to the amended complaint as alleging "at most, a few

isolated City actions"). As the Court explained above, *see supra* Section 3.2.1.3, Relators have sufficiently alleged a pattern. That pattern may be transformed into a successful pleading of a scheme, which denotes scienter, in accordance with *Mei Ling* and *Berkowitz*. Relators have been afforded leave to amend on this issue. In the same vein, the City again argues that Relators have not identified specific statutory or regulatory provisions to supply a legal standard that the City could have knowingly violated. The Court agrees, and already addressed this point above. *See supra* Section 3.2.1.2. Relators have been afforded leave to amend on this point.

### 3.2.3 Materiality

Finally, the City argues that Relators' complaint fails on the fourth element of an FCA claim: materiality, or "that the government actually attaches weight to the [condition for payment] and relies on compliance with it." *Molina Healthcare*, 17 F.4th at 740; *see also* 31 U.S.C. § 3729(b)(4) (defining "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"). "Materiality . . . cannot be found where noncompliance is minor." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016).

As the Court has now discussed ad nauseam, Relators have failed to cite both (1) the specific statutory regulations and provisions that require certification of compliance, when those provisions were in place and to which programs they apply, as well as (2) with which specific statutory regulations and provisions (for example, federal anti-discrimination statutes) the City falsely certified compliance. Without these specifics, they are unable to adequately plead that HUD required certification as a condition of payment. Also as already discussed ad nauseam, Relators will be afforded leave to amend to do so.

The Court agrees with the City that, in addition, Relators must also plead the effect compliance has on the government. "It is not enough to simply say that the government required compliance with a certain condition for payment." *Molina Healthcare*, 17 F.4th at 740. Once again, however, the Court disagrees that Relators' failure to adequately plead such an effect is due to the AFFH mandate being "chiefly a planning requirement." ECF No. 38 at 32 ("Relators fail to plausibly allege that the facts they say rendered the certifications false would influence HUD's payment decisions, given that the AFFH mandate is chiefly a planning requirement."). Also as discussed, the Court disagrees that Relators plead only "isolated instances" that "cannot be seen as more than minor or insubstantial." *Id.* However, the City certainly has a point that Relators' amended complaint lacks a link between the facts alleged and (for example) the goals of the FHA, or other HUD regulations, such that materiality is adequately pleaded. The amended complaint is also dismissed without prejudice on this basis. However, because it is remediable, Relators will be afforded leave to amend.

### 3.3    Allegations Specific to HACM and the County

As HACM notes, only approximately 15 paragraphs of the "Facts" section of Relators' amended complaint refer to "Defendants" or to "HACM." ECF No. 34. The amended complaint is largely focused on the City. As to HACM, Relators allege that HACM uses HUD funding to provide subsidized public housing and Section 8 assistance, is required to certify compliance with and/or furtherance of federal and state anti-discrimination and public safety laws, and has falsely certified that compliance because housing and Section 8 programming is administered in a discriminatory and unsafe fashion. Many of the bases the Court found

Case 2:22-cv-00240-JPS   Filed 04/10/23   Page 33 of 36   Document 55

sufficiently pleaded as to the City, therefore, such as the formation of a pattern of incidents, are inapplicable to HACM. In the same vein, all of the bases the Court found insufficiently pleaded as to the City are also insufficiently pleaded as to HACM. Moreover, certain of the 15 paragraphs that may be attributed to HACM refer generally to "Defendants." This is insufficient under Rule 9(b). "[I]n a case involving multiple defendants, . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)

The same is true as to the County. With respect to the County, only approximately 11 paragraphs of the amended complaint refer to "Defendants" or "the County." The allegations against the County are nearly identical to those against HACM, with additional allegations that the County has "been made aware" of its noncompliance, has funded rooming houses by paying above market rent, and has ignored concerns about sex offenders in the Clark House. ECF No. 34 at 20, 25, 42. As with HACM, these allegations are wholly insufficient under 9(b). The County also suffers from the same "Defendants" lumping issue as HACM and, for that matter, so does the City.

For all these reasons, the amended complaint is dismissed without prejudice as to HACM and the County. Because many of the deficiencies are the same as those identified with regard to the City, and the Court has found them remediable, Relators may have leave to amend their pleading as against HACM and the County.

4. **CONCLUSION**

For all these reasons, the Court (1) dismisses HSHD from this action, (2) grants HACM's motion to join the City's motion to dismiss, (3) denies

the City's and the County's motions to dismiss for lack of jurisdiction, and (4) grants the City's, HACM's, and the County's motions to dismiss for failure to state a claim. The amended complaint is dismissed without prejudice. Relators have been afforded leave to amend and to file a second amended complaint. Failure to file a second amended complaint within **thirty (30) days of this Order** will result in dismissal of the action with prejudice.

Accordingly,

**IT IS ORDERED** that Defendant Milwaukee County Health and Human Services Housing Division be and the same is hereby **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that Defendants City of Milwaukee and City of Milwaukee Community Development Grants Administration's motion to dismiss for lack of jurisdiction, ECF No. 37, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Milwaukee County's motion to dismiss for lack of jurisdiction, ECF No. 45, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Housing Authority of the City of Milwaukee's motion to join Defendants City of Milwaukee and City of Milwaukee Community Development Grants Administration's motion to dismiss, ECF No. 42, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants City of Milwaukee and City of Milwaukee Community Development Grants Administration's motion to dismiss for failure to state a claim, ECF No. 37, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Housing Authority of the City of Milwaukee's motion to dismiss for failure to state a claim, ECF No. 40, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Milwaukee County's motion to dismiss for failure to state a claim, ECF No. 45, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the amended complaint, ECF No. 34, be and the same is hereby **DISMISSED without prejudice**; Relators James Dieter and Karen Schwenke may file a second amended complaint within **thirty (30) days of this Order**.

Dated at Milwaukee, Wisconsin, this 10th day of April, 2023.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge