# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA *ex rel*. JAMES DIETER and KAREN SCHWENKE,

                Plaintiffs,

v.

CITY OF MILWAUKEE, CITY OF MILWAUKEE COMMUNITY DEVELOPMENT GRANTS ADMINISTRATION, HOUSING AUTHORITY OF THE CITY OF MILWAUKEE, and MILWAUKEE COUNTY,

                Defendants.

Case No. 22-CV-240-JPS

**ORDER**

---

Relators James Dieter and Karen Schwenke ("Relators") allege that Defendants City of Milwaukee, City of Milwaukee Community Development Grants Administration (together, the "City"), Housing Authority of the City of Milwaukee ("HACM"), and Milwaukee County (the "County") (collectively, "Defendants") violated the False Claims Act, 31 U.S.C. § 3729 (the "FCA") by falsely certifying compliance with, *inter alia*, anti-discrimination and housing laws in order to receive government funding. ECF No. 58. After the Court dismissed Relators' first amended complaint without prejudice, ECF No. 55, Relators filed a second amended complaint. ECF No. 58. Defendants now move to dismiss the second amended complaint. ECF Nos. 60 (HACM's motion), 62 (the City's motion),

65 (the County's motion). The motions are fully briefed, ECF Nos. 61, 63, 66, 73, 75, 76, 77, and for the reasons set forth below, will be granted.

1.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which, among other things, fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In other words, the plaintiff must set forth the "'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)).

2.    **RELEVANT ALLEGATIONS**

2.1    **Certifications**

Defendants receive federal funding from the United States Department of Housing and Urban Development ("HUD"). ECF No. 58 at

7. HUD disburses funds to Public Housing Agencies ("PHAs"), which then disburse funds on a local level. *Id.* HACM and the County are registered PHAs. *Id.* From HUD, Defendants receive funds pursuant to four programs: the Community Development Block Grant ("CDBG"), the HOME Investment Partnership ("HOME"), the Emergency Shelter Grant, and Housing Opportunities for People with AIDS. *Id.* HACM and the County also receive funds from HUD through the Section 8 Housing Choice Voucher program (the "Housing Voucher program"). *Id.* at 8.

As a condition to receiving federal funds, Defendants are required to comply with federal anti-discrimination laws and to "Affirmatively Further the Purposes of the Fair Housing Act (the "AFFH mandate"). *Id.* at 3. The federal antidiscrimination laws include, *inter alia*, Title VI of the Civil Rights Act ("Title VI"), Section 504 of the Rehabilitation Act ("Section 504"), and the Americans with Disabilities Act (the "ADA"). *Id.* at 9, 11. The AFFH mandate is set forth in the Fair Housing Act (the "FHA") and HUD program-specific regulations, as well as defined in HUD's regulations. *Id.* at 9–11. HUD requires that fund recipients certify their compliance with federal anti-discrimination laws and the AFFH mandate. *Id.* at 10, 11.

Relators plead, *inter alia*, the following statutory and regulatory anti-discrimination provisions with which they claim Defendants failed to comply during the relevant statutory period (between February 25, 2016 and February 25, 2022):

- Section 109 of the Housing and Community Development Act of 1974 ("HDCA"), 42 U.S.C. § 5309, and the implementing regulations set forth at 24 C.F.R. § 6.4(a). *Id.* at 72–73. The regulations require, *inter alia*, that recipients "not make selections that have the effect of excluding persons from, denying them the benefits of, or subjecting them to discrimination" when "determining the site or location of

housing," "take any necessary steps to overcome the effects of prior discrimination," and submit sufficient records for the federal government to ascertain compliance. *Id.*

- Section 504 and the implementing regulations set forth at 24 C.F.R. § 8.4(a). *Id.* at 74–76. The regulations require, *inter alia*, that no person be excluded or discriminated against "under any program or activity that receives Federal financial assistance" on the basis of "handicaps," that recipients not "utilize criteria or methods of administration the purpose or effect of which" would be to discriminate or "impair the accomplishment of the objectives of the recipient's federally assisted program." *Id.*

- Title VI and the implementing regulations set forth at 24 C.F.R. § 1.4(b). *Id.* at 77–79. The regulations require, *inter alia*, recipients not, "on the ground of race, color, or national origin" "[p]rovide any housing . . . to a person which are different, or are provided in a different manner, from those provided to others," "[s]ubject a person to segregation or separate treatment in any matter related to his receipt of housing," and "take affirmative action to overcome the effects of prior discrimination." *Id.*

Relators also plead the three iterations of the AFFH mandate (as defined in HUD's regulations) in effect during the relevant statutory period. From July 16, 2015 through August 6, 2020, the AFFH mandate included

> taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with racially balanced living patterns, transforming racially or ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws.

*Id.* at 69–70 (quoting 80 Fed. Reg. 42272 (July 16, 2015); 86 Fed. Reg. 30779 (June 10, 2021)). The term "meaningful actions" was defined as "significant

actions that are designed and can be reasonably expected to achieve a material positive change that affirmatively furthers fair housing by, for example, increasing fair housing choice or decreasing disparities in access to opportunity." *Id.* at 70 (quoting 80 Fed. Reg. 42272 (July 16, 2015); 86 Fed. Reg. 30779 (June 10, 2021)) The term "fair housing choice" was defined to mean that "individuals and families have the information, opportunity, and options to live where they choose without unlawful discrimination and other barriers related to race, color, religion, sex familial status, national origin, or disability." *Id.* (quoting 80 Fed. Reg. 42272 (July 16, 2015); 86 Fed. Reg. 30779 (June 10, 2021)).

From August 7, 2020 through July 30, 2021 the AFFH mandate for the HOME and CDBG programs changed. *Id.* (citing 85 Fed. Reg. 45899 (Aug. 7 2020)). The AFFH mandate during this time required recipients to certify that they took action "rationally related to promoting one or more attributes of fair housing." *Id.* (quoting 85 Fed. Reg. 45899 (Aug. 7 2020) and 24 C.F.R. § 5.151 (2020)). The term "fair housing" was defined as "housing that, among other attributes, is affordable, safe, decent, free of unlawful discrimination, and accessible as required under civil rights laws." *Id.* (quoting 85 Fed. Reg. 45899 (Aug. 7 2020) and 24 C.F.R. § 5.151 (2020)).

From July 31, 2021 through the present, the substance of the 2015 AFFH mandate was reinstated:

> Affirmatively furthering fair housing means taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity,

replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially or ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws. The duty to affirmatively further fair housing extends to all of a program participant's activities and programs relating to housing and urban development.

*Id.* at 70–71 (quoting 86 Fed. Reg. 30779 (June 10, 2021) and 24 C.F.R. § 5.151).

## 2.2 Submissions

As PHAs, HACM and the County are required to submit annual PHA plans as well as five-year PHA plans. *Id.* at 11 (citing 42 U.S.C. § 1437c-1). The annual PHA plans require HACM and the County to annually submit a signed certification confirming that they would "carry out the public housing agency plan" in conformity with Title VI, the FHA, Section 504, the ADA, and the AFFH mandate. *Id.* (citing 42 U.S.C. § 1437c-1(d)(16)). Relators plead the date, document title, and nature of the certification of HACM's annual PHA plans from 2015 through 2023. *Id.* at 11–15. As to HACM's 2023 annual PHA plan, Milwaukee Mayor Cavalier Johnson executed a certification of consistency with the City's Consolidated Plan. *Id.* at 14. The City separately approved HACM's 2023 annual PHA plan. *Id.* at 15. The County also executed certifications of compliance with Title VI and the FHA and implementing regulations in connection with annual action plans from 2015 through 2023. *Id.* at 16.

HUD ensures compliance with federal anti-discrimination laws and the AFFH mandate by requiring recipients to submit various additional plans. *Id.* at 19. These plans include the Consolidated Plan, the Annual Action Plan, and Consolidated Annual Performance and Evaluation Reports ("CAPER"). *Id.* Relators plead the City's and the County's CAPER,

Consolidated Plan, and Annual Action Plan submission dates from approximately 2015 through the present. *Id.* at 19–20. CAPERs set forth "specific and detailed information regarding how the recipient spent federal funds received from HUD." *Id.* at 19. Consolidated Plans are "carried out through Annual Action Plans, which provide a concise summary of the actions, activities, and the specific federal and non-federal resources that will be used each year to address the priority needs and specific goals identified by" the Consolidated Plans. *Id.* at 20. Grantees report on accomplishments and progress towards Consolidated Plan goals in CAPERs. *Id.*

The City's 2015 through 2021 Annual Action Plans (except for 2019 and 2022, which do not exist) each included the following affirmation:

**Actions planned during the next year to address the needs to public housing**

Increase the availability of decent, safe, and affordable housing; maximize the number of affordable units available to the PHA within its current resources; promote self-sufficiency and asset development of families and individuals; conduct activities to affirmatively further fair housing; increase awareness and target PHA resources among families of races and ethnicities with disproportionate needs and to families with disabilities; target available assistance to the elderly and families at or below 30% and 50% of AMI.

*Id.* at 21. The City's 2015 through 2017 Annual Action Plans included the following "Barriers to affordable housing," in pertinent part:

- Lack of enforcement mechanism for complaints of discrimination
- Lack of housing units accessible to persons with disabilities
- Overcrowded housing

- Lack of affordable housing supply

- Social class, racial and cultural barriers

- Housing and employment discrimination

- Residential segregation

- Inadequate income

- Racial disparities in mortgage lending

- Insurance redlining; appraisal practices

- Racial steering

*Id.* at 21–22. The 2018, 2020, and 2021 Annual Action Plans "contain similar wording regarding 'barriers to affordable housing' and included the same concepts." *Id.* at 22.

The City's 2015 through 2018 CAPERs stated that the City "conducted activities to affirmatively further fair housing; increased awareness and targeted PHA resources among families of races and ethnicities with disproportionate needs and to families with disabilities." *Id.* at 22–23. The City's 2019 and 2020 CAPERs included "similar language." *Id.* at 23. Relators also aver that the City has submitted certifications, signed by the mayor, that it would comply with the AFFH mandate as well as Title VI, Section 504, and the ADA, but that those certifications are not available in the City's online database. *Id.* at 24.

Additionally, HACM and the County receive funds from HUD to administer the Housing Voucher program. *Id.* at 57. Through the Housing Voucher program, the County or HACM make payments to landlords for a percentage of rent charged to a tenant and for development of multi-family buildings for use as housing for low-income, elderly, and disabled individuals. *Id.* at 57–58. The County also receives funds from HUD's

HOME and CDBG programs to assist with provision of suitable, safe, and sanitary housing to these individuals. *Id.* at 58.

In exchange, HACM and the County are required to certify that the housing is compliant with 24 C.F.R. § 982.401 and all applicable housing codes and ordinances, non-discriminatory, and in furtherance of the policies and purposes of the FHA. *Id.* at 58–59. HUD inspects each recipient property for compliance. *Id.* at 59. Section 982.401 requires, *inter alia*, that recipient properties be free of electrical hazards, dangerous walks or steps, holes, loose surface materials, buckling, or broken windows. *Id.* at 59–62.

### 2.3    Compliance

Despite HACM's and the County's "decades of explicit certifications . . . to affirmatively further fair housing and comply with anti-discrimination laws," confirmations "that the City must take affirmative steps to further fair housing and stop discrimination," and the City's language in the Annual Action Plans and CAPERs, "no real, tangible positive change has occurred in the Near West Side and similar containment zone areas." *Id.* at 18–19. The United States would not have made any payment to HACM, the County, or the City had they failed to submit the requisite plans or certifications. *Id.* at 25–26.

Specifically, Relators contend that the City has "found it much more profitable to create containment zones . . . in which to house the City's low-income population, minorities, disabled individuals and criminals while simultaneously devoting substantial resources to neighborhoods comprised of middle to upper income, non-minority, and non-disabled residents." *Id.* at 26. Relators extensively detail specific problems with "[a] neighborhood example": the Near West Side (the "NWS"), where Relators

live and/or invest and have personally observed Defendants' refusals to adhere to anti-discrimination laws and the AFFH mandate. *Id.* at 28.[1]

Instead of addressing disparities or replacing segregated living patterns with racially balanced living patterns, the City knowingly "further densified the already blighted neighborhoods," leading to containment zones consisting of upwards of 82% minorities. *Id.* at 80, 81. Instead of fostering compliance with anti-discrimination and housing laws through "meaningful actions," the City "maintained the status quo of a century's worth of explicit and implicit discrimination." *Id.* Between August 7, 2020 and July 31, 2021, when a different definition of the AFFH mandate was in force with respect to CDBG and HOME, the City "did not engage in conduct rationally related to promoting fair housing"; instead, "[r]eports of bedbugs, mice, rats, no heat, electrical issues, and various building code violations were rampant." *Id.* at 80–81.

As to HACM and the County, Relators additionally allege failure to provide suitable, safe, and sanitary housing in accordance with the Housing Voucher program, refusal to adhere to anti-discrimination laws, and failure to affirmatively further the purposes of the FHA. *Id.* at 56. Relators have observed numerous recipient properties in the NWS that do not comply with the requirements set forth in 24 C.F.R. § 982.401; the persons most adversely impacted are the disabled, minority, and/or elderly. *Id.* at 62–66. Additionally, HACM and the County knowingly failed to abide by the AFFH mandate by, like the City, "maintain[ing] the status quo by placing

---

[1] The Court described at length the specific problems Relators have observed in the NWS, and the data they cite regarding the NWS, in its order dismissing the first amended complaint without prejudice. ECF No. 55 at 5–13. The Court incorporates that summary here by reference.

all very low-income minority, disabled, and elderly persons within the containment zones in dwellings that were and are unsafe, unsanitary, indecent, and unsuitable." *Id.* at 83.

### 3.   ANALYSIS[2]

#### 3.1   Elements of Relators' Claim Applicable to All Defendants[3]

Relators plead their FCA claim under 31 U.S.C. §§ 3729(a)(1)(A) and (B). ECF No. 58 at 2.  These sections "impose[] liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778 (7th Cir. 2016) (quoting 31 U.S.C. §§ 3729(a)(1)(A) & (B)).

To state such a claim, Relators must show "(1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Id.* (citing *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011)). As a fourth element, Relators must show "that the

---

[2]For largely the same reasons set forth in its prior order, ECF No. 55 at 13–14, the Court denies HACM's motion to dismiss based on the public disclosure bar. ECF No. 61 at 6–8. While Relators plead that they learned about rodents, mold, and the like in HACM housing through news articles, they also plead that they personally observed these conditions. ECF No. 58 at 63, 66. HACM's contention that "[t]here are no factual allegations that *HACM* was involved with creating or perpetuating the so-called 'containment zones'" is not pertinent to the public disclosure bar and will be addressed on the merits. ECF No. 61 at 7–8.

[3]As in the Court's prior order, "the citations to briefing and argument summaries in this section largely derive from the City's briefing." ECF No. 55 at 15 n.6. "[T]o the extent applicable, the analysis in this section also applies to HACM and the County." *Id.* Indeed, the County's arguments in particular largely mirror the City's. ECF No. 66 at 3–4. The Court will take up HACM's and the County's arguments that differ from the City's at the conclusion of this Order.

government actually attaches weight to that [condition for payment] and relies on compliance with it." *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 733, 740 (7th Cir. 2021).

Relators proceed primarily on an implied certification theory of liability, ECF No. 73 at 4–5, which requires that they establish two elements as to Defendants' submissions to the government: "'first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.'" *United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1086 (N.D. Ill. 2019) (quoting *United States ex rel. Nelson v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016)).

"Because it is an anti-fraud statute, claims under the FCA" are subject to the Rule 9(b) heightened pleading standard. *Id.* Thus, Relators must plead the "who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (quoting *Rolls-Royce Corp.*, 570 F.3d at 854).

### 3.1.1   Falsity

The City argues that Relators' claim fails primarily on the second element: falsity. The City identifies two deficiencies in Relators' pleading of this element: (1) Relators "have not sufficiently identified *what* legal standards the City allegedly violated that render its certifications false"; and (2) Relators "have not plausibly alleged *how* the City has violated statutes or regulations underlying the City's certifications." ECF No. 63 at 9, 10 (capitalization omitted).

Case 2:22-cv-00240-JPS   Filed 10/27/23   Page 12 of 26   Document 78

### 3.1.1.1 "What" Legal Standards Were Violated

In its order dismissing Relators' first amended complaint without prejudice, the Court was guided primarily by *Hanna*, a "case with nearly identical underlying facts to those at bar." ECF No. 55 at 17 (citing *Hanna*, 834 F.3d at 781). There, the relator alleged that the City of Chicago's policies of "'aldermanic privilege' and strategic zoning . . . actually *increased* segregation, making its certifications false." *Hanna*, 834 F.3d at 776. The Court again turns to *Hanna* for guidance.

*Hanna* teaches that to plead the "what" portion of the falsity element where "the allegedly false certification relates to a failure to comply with certain statutory and regulatory provisions," Relators must present more than "an undifferentiated raft of statutory and regulatory provisions." *Id.* at 779. In addition to pleading specific provisions, Relators must "draw a link between the statutes [they cite] and any particular alleged false certification." *Id.* The reason for these requirements is to allow the court, on a motion to dismiss, "to determine whether the defendant actually falsely certified compliance with any specific provision." *Id.* at 780.

The Court found that the first amended complaint was deficient in both respects. The Court explained that it needed to know which specific provisions Defendants are alleged to have violated "in order to have a metric against which to measure the factual allegations in light of the applicability of Rule 9(b)." ECF No. 55 at 21. The Court also noted that Relators needed to "adequately tie all of the instances of alleged misconduct they have raised to specific statutory or regulatory provisions." *Id.* at 28.

Unfortunately, Relators have not cured these defects. With respect to the statutory and regulatory provisions Defendants are alleged to have violated, Relators now submit ten pages of provisions, all lumped together,

Case 2:22-cv-00240-JPS   Filed 10/27/23   Page 13 of 26   Document 78

with no effort to excerpt only the portions pertinent to this case. *See, e.g.*, ECF No. 58 at 77 (describing access to financial aid). Immediately after this recitation, Relators plead five pages of generic statements, such as "the City did not foster or maintain compliance with civil rights and fair housing laws," or "the City perpetuated blight." *Id.* at 80.

Not only are these allegations far too vague to satisfy Rule 9(b), but they are not linked to any specific statute or regulation from the submitted compendium. Nor are the more specific instances of misconduct that Relators plead—such as the examples in the NWS, which the Court previously held to constitute a pattern of misconduct, ECF No. 55 at 28—tied in any manner to specific statutes and regulations from the compendium. Relators have therefore once again pleaded an "undifferentiated raft" of provisions and neglected to "draw a link [to] . . . any particular alleged false certification." *Hanna*, 834 F.3d at 779.

It is simply not Defendants' or the Court's role to match the statutory and regulatory provisions with each alleged violation; the case law is clear that task rests with Relators. *Id.* (requiring that the relator "draw a link" between provisions and allegedly false certifications); *United States v. Joel Kennedy Constructing Corp.*, 584 F. Supp. 3d 595, 611 (N.D. Ill. 2022) (even under implied certification theory, "[a] violation of a regulation 'is not synonymous with filing a false claim'") (quoting *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018)); *U.S. ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 627 (5th Cir. 2015) ("Even if the cited provisions did apply to defendants' actions, [the relator] merely lists them and has not pleaded how they were violated. [The relator] uses conclusory terms . . . but does not explain how [the defendants' actions] failed to comply with . . . any applicable regulation.").

Similarly, in its prior order, the Court underwent an exhaustive analysis of the history of the AFFH mandate and held that Relators could amend their complaint to "plead which version of the AFFH mandate is at issue at which time," while avoiding conclusory allegations. ECF No. 55 at 26, 28; *id.* at 21–26. While Relators now plead the different versions of the AFFH mandate, and then plead that the City failed to take "meaningful actions" or engage in "conduct rationally related" to promoting fair housing (depending on which AFFH mandate was in force), ECF No. 58 at 80, these allegations are wholly conclusory and again fail to tie specific examples of misconduct to the specific AFFH mandates.

Without matching allegations to the specific standard at play at each specific time, as the Court ordered Relators to do, neither the Court nor the Defendants can ascertain either "a specific misrepresentation on a claim's face or . . . omitted information that renders the *description* of" Defendants' plans or actions misleading. *Walgreen Co.*, 417 F. Supp. 3d at 1086 (citing *United States ex rel. Lisitza v. Par Pharm. Cos., Inc.*, 276 F. Supp. 3d 779, 798 (N.D. Ill. 2017) and *Midwest Com. Banking Co. v. Elkart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993)). One simply cannot determine whether information is misleading without knowing the metric against which it is weighed. Therefore, Relators have failed to plead the requisite "what" element of the alleged fraud.

### 3.1.1.2 "How" the Legal Standards Were Violated – Anti-Discrimination Laws

Even if this "scattershot" pleading approach were sufficient to link the provisions with the alleged instances of misconduct, Relators do not plausibly allege a violation of federal anti-discrimination laws; in other words, *how* those laws were violated. Relators now concede that they

pursue "a disparate *impact* theory of liability; not disparate *treatment*." ECF No. 73 at 11.[4] As earlier noted, the Court held in its prior order that Relators have alleged sufficient facts to support a pattern, at least within the NWS.[5] ECF No. 55 at 28. The Court explained that it viewed Relators' focus on the NWS as serving the purpose of showing "an example" of how the certifications are false. *Id.* at 27.[6]

---

[4]The Court previously recognized that HUD has promulgated disparate impact agency regulations. ECF No. 55 at 22 (citing, *e.g.*, 24 C.F.R. § 1.4(b)(2)(i)).

[5]In the prior round of briefing, the City argued that many of Relators' allegations regarding the NWS were "inconsistent with transcripts from hearings and other 'judicially-noticeable records.'" ECF No. 55 at 29 (quoting ECF No. 38 at 24–27). The Court took judicial notice of those records but opted to defer ruling on the issue given that it had already decided to allow Relators to amend their first amended complaint. *Id.* (citing *Murphy v. United Parcel Serv., Inc.*, 528 F. Supp. 3d 983, 986 (E.D. Wis. 2021)). The Court urged Relators to "carefully review their amended complaint and ensure that each and every allegation is accurate" and warned that should the allegations "continue to be demonstrably inaccurate by an undisputed matter of public record, the Court will entertain a renewed request for dismissal on this issue." *Id.*

The City now argues that Relators did not heed the Court's warning. However, the allegations with which the City takes issue are not demonstrably inaccurate. For example, the City argues that Relators continue to plead that the Milwaukee Police Department withheld the number of police calls made to the Clark House rooming house at a Licenses Committee hearing, despite the City explaining in its first motion that the Milwaukee Police Department is only required to provide the number of reports, not calls. *Compare* ECF No. 58 at 51–52, *with* ECF No. 38-2 at 107 and Milwaukee Code of Ordinances § 85-21(2). But this is an inference that does not plainly contradict Relators' assertion. At best, "the factual conclusions that [the City] draw[s] from [its] interpretation of the evidence" differ from Relators', but these are "not the type of adjudicative facts intended for judicial notice under Rule 201." *United States v. Zabka*, No. 10–1078, 2011 WL 13217342, at *2 (C.D. Ill. July 14, 2011).

[6]Rule 9(b) does not require a plaintiff to plead facts "showing that the representation is indeed false." *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992). The Court viewed the NWS example as sufficient to raise a pattern of misconduct *if* Relators "adequately tie [the pattern of misconduct] to specific statutory or regulatory provisions," sufficient to put Defendants on notice

However, in the *disparate impact* context, even "a multi-decade scheme involving a series of decisions by many different actors is not the sort of zoning law or housing restriction the FHA is intended to address." *Mabry v. City of E. Chicago*, No. 2:16-CV-402-JVB-JEM, 2021 WL 5141371, at *2 (N.D. Ind. Oct. 20, 2021). In other words, "[d]isparate-impact analysis looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment." *City of Joliet v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016).

Thus, Relators' position that they allege only a disparate impact claim does not square with their focus on only the pattern of decisions made by a litany of actors and defendants in the NWS. Apart from the specific examples in the NWS, Relators plead only conclusory allegations. *See, e.g.*, ECF No. 58 at 32 ("The City's failure to follow its own Plan in the [NWS] exemplifies its failure to desegregate, de-densify, and eliminate blight in other pockets of the City."); 47 ("The City of Milwaukee does not enforce building codes within the [NWS] (and other containment zones) . . . ."); 67 ("The City, HACM, and Milwaukee County have treated the [NWS] and other containment zones within the City much differently than other neighborhoods within the City."). Indeed, even in *Hanna*, the relator alleged "policies . . . [of] 'aldermanic privilege' and strategic zoning" by pointing to specific ordinances. 834 F.3d at 776. Against this backdrop and through the lens of disparate impact only, Relators' allegations simply do not cut it under Rule 9(b).

---

of the laws they are alleged to have violated. ECF No. 55 at 28. The Court analyzes the NWS example therefore on whether, as pleaded, it satisfies the applicable legal standard, not on whether Relators' allegations regarding the NWS *actually* show that a specific certification is false.

Even if the Court were to construe Relators' second amended complaint as alleging a policy of creating containment zones, Relators' "amended complaint contains no factual allegations" showing a "relevant and statistically significant disparity" between the containment zones and other areas. *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) ("Disparate-impact plaintiffs are permitted to rely on a variety of statistical methods *and comparisons* to support their claims.") (emphasis added). Relators provide a litany of statistics but with no comparators. *See, e.g.*, ECF No. 58 at 32 ("Recent statistics show that approximately Eighty-Two Percent (82%) of the Near West Side is comprised of minorities."); 33 ("Over 15% of the State's homeless beds are located within the three (3) zip codes comprising the Near West Side – a 2.6 square mile area."). The only concrete alleged containment zone Relators raise other than the NWS is deficient in the same respect. *Id.* at 48 ("[A]pproximately 80% of single- and two-family rental properties within the 53206 ZIP code (another containment zone) have electrical building code violations.").

There are plainly "no allegations about the number of [zones or neighborhoods] and the racial makeup of [those zones or neighborhoods] as compared to" the NWS or any other purported containment zones. *Adams*, 742 F.3d at 733. In the same vein, only one example of a disparity — here, the NWS—is insufficient. *see also County of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 992 (N.D. Ill. 2018) (FHA disparate impact claim requires identification of "a *set* of *related* statistical disparities") (emphases added) (citing *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015)).

In addition to a statistical disparity, Relators must also show a "robust causality" between the defendant's policy and the disparity to

avoid "the displacement of valid governmental policies." *Inclusive Cmtys.*, 576 U.S. at 540, 542. A mere allegation that a defendant chose to "build low-income housing in a blighted inner-city neighborhood," which is essentially what Relators claim here as to the NWS, does not suffice, particularly given the "multiple factors that go into . . . decisions about where to construct or renovate housing units." *Id.* at 542–43. Thus, Relators do not adequately plead a disparate impact theory of liability sufficient to show "how" the alleged anti-discrimination laws were violated.

### 3.1.1.3   "How" the Legal Standards Were Violated – AFFH Mandate

Similarly—and again assuming Relators' pleading approach sufficiently links specific instances of misconduct to each version of the AFFH mandate—Relators do not plausibly allege *how* Defendants have failed to follow the AFFH mandate, either as set forth in the FHA or in HUD's regulations. "[C]ourts have held that funding recipients, to meet their AFFH obligations, must, at a minimum, ensure that they make decisions informed by preexisting racial and socioeconomic residential segregation." 86 Fed. Reg. 30779-01 (June 10, 2021). While the AFFH mandate changed during the relevant statutory period from a requirement to take "meaningful actions" to further the FHA to taking action "rationally related to promoting one or more attributes of fair housing" and back, it has always required some form of affirmative action. As the Court explained in its prior order, the AFFH mandate is not merely a planning requirement. ECF No. 55 at 25–36. While the AFFH mandate contemplates "ending discrimination and segregation," "the precise actions needed depend on the local context." 86 Fed. Reg. 30779-01 (June 10, 2021) (quoting *N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 155 (1st Cir. 1987)). "[T]o carry out

Case 2:22-cv-00240-JPS   Filed 10/27/23   Page 19 of 26   Document 78

this AFFH obligation effectively, HUD and its grantees must 'consider the effect of a HUD grant on the racial and socio-economic composition of the surrounding area,' including historical patterns of segregation." *Id.* (quoting *N.A.A.C.P.*, 817 F.2d at 156).

As the City notes, Relators' gripe is with the fact that "the [NWS] continues to be severely segregated, densified, and blighted." ECF No. 58 at 32. But Relators' laser focus on the NWS harms them with respect to the AFFH mandate just as it did with the anti-discrimination laws. Relators do not plead that Defendants failed to account for or omitted information regarding the NWS or containment zones in their HUD submissions, but rather that the outcome in one neighborhood has not met their wishes.

The first version of the AFFH mandate, which was in place at the beginning of the statutory period and again at the end, explains that it "does not mandate specific outcomes." 80 Fed. Reg. 42272-01 (July 16, 2015); *see also U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester County*, 668 F. Supp. 2d 548, 565 (S.D.N.Y. 2009) ("The statutory and regulatory framework . . . imposes no duty on the County to undertake any particular course of action to overcome an impediment to fair housing . . . . The law does, however, require the recipient of the federal funds to certify that it will take 'appropriate' actions to overcome the . . . impediments . . . that its analysis has identified, and to maintain records reflecting both that analysis and those actions."). In *Westchester County*, for example, the Government reviewed the County's HUD submissions and pleaded that the County "never did the required analysis of race-based impediments," not that it promised but did not achieve a specific outcome. *Id.*

While the Court urged Relators in its prior order to meaningfully engage with Defendants' HUD submissions, ECF No. 55 at 20, Relators

have cited only the AFFH mandate itself, *see, e.g.*, ECF No. 58 at 22, rather than parsing the steps that *are* described to have been accomplished (or will be accomplished) and how and where those steps omit information and/or how those omissions are misleading. *See generally* ECF No. 63-1 (City's CAPERs describing programs that were put in place and where, including in the NWS, in respective years). Again, it is not enough to plead general dissatisfaction to place a defendant on notice of what it did wrong. As noted above, in its prior order, the Court carefully examined the required standard in each version of the AFFH mandate "in order to dispel confusion on the issue as Relators work on a second amended complaint." ECF No. 55 at 22–26. Nonetheless, in the second amended complaint, all Relators do is parrot the certifications and text of the AFFH mandate from the respective submissions.

Additionally, even if Relators had done more than regurgitate the text of the AFFH mandate, in the implied certification context, pleading one example of omitted information, such as the NWS, is insufficient because it "provides no basis to infer that [the defendant] necessarily" consistently omitted that information in a manner that violates federal law. *Walgreen Co.*, 417 F. Supp. 3d at 1088; *see also Inclusive Cmtys.*, 576 U.S. at 542 ("The FHA does not . . . put housing authorities . . . in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing . . . ."). Therefore, for all these reasons, the second amended complaint will be dismissed for failure to adequately plead falsity.

### 3.1.2   Scienter and Materiality

Having determined that Relators fail to adequately plead falsity, the Court need not analyze the third and fourth elements of their FCA claim: scienter and materiality. The Court only briefly notes that, by failing to

plead the "what" and "how" of the falsity, Relators not only fail to apprise Defendants of what they did wrong, but also cannot show that Defendants knew they did anything wrong. "In the absence of a link between the representation and the intention not to abide by it, there cannot be a knowingly false claim." *United States v. City of Chicago*, No. 11-CV-04885, 2015 WL 5461664, at *2 (N.D. Ill. Sept. 16, 2015) (citing *U.S. ex rel. Hill v. City of Chicago*, 772 F.3d 455, 456 (7th Cir. 2014)).

The Court also parenthetically notes that the Seventh Circuit recently held that a government's decision "to pay despite knowing of [a] party's noncompliance, [is] 'very strong evidence' . . . that the condition is not material." *Molina Healthcare of Ill., Inc.*, 17 F.4th at 74 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016)). After Relators filed this suit and apprised HUD of their allegations, HUD awarded $24 million to the City under the programs at issue. ECF No. 63 at 31 n.18.

### 3.2    Issues Specific to HACM and the County

As explained above, *see supra* note 3, the preceding analysis applies in equal measure to HACM and the County, and the case stands dismissed as against HACM and the County on those bases as well. However, for the sake of thoroughness, the Court briefly addresses issues HACM and the County raise that differ from the City's arguments.

HACM argues that Relators have failed to establish that HACM submitted any *claim* for funds. ECF No. 61 at 9; ECF No. 75 at 7. Under Relators' implied certification theory of liability, ECF No. 73 at 4, Relators must plead that the "particular certification of regulatory compliance was a *condition* of payment of government money." *U.S. ex rel. Gross v. AIDS Rsch. All.-Chi.*, 415 F.3d 601, 605 (7th Cir. 2005). While Relators plead that

Case 2:22-cv-00240-JPS   Filed 10/27/23   Page 22 of 26   Document 78

HACM submitted annual PHA plans with signed certifications, they do not adequately plead that these plans were conditions for payment, *i.e.*, claims. ECF No. 75 at 6. The only pertinent allegation is pleaded "[o]n information and belief." ECF No. 58 at 16. As the Court explained in its prior order, fraud cannot be pleaded on information and belief unless the plaintiff also pleads that "the facts constituting the fraud are not accessible to" the plaintiff and "the grounds for [his] suspicions." ECF No. 55 at 20 (quoting *Pirelli*, 631 F.3d at 443). HACM correctly asserts that Relators have pleaded neither. Thus, this is an independent issue sufficient for dismissal as to HACM; Relators have failed to properly plead "when" and "where" HACM submitted claims for payment. *Id.*

Similarly, the County argues that while Relators generally allege the dates and titles of documents the County submitted, they fail to plead "the actual claims for payment, how they were paid, when, for which locally run program, by what method, and in what amount." ECF No. 66 at 4 (citing *Gross*, 415 F.3d at 605). Nor do they plead similar facts to support their conclusory allegations that the County has failed to inspect dwellings subject to the Housing Voucher program. *Id.* at 10–11 (explaining that County inspection records are public).

As the Court held in its prior order, Relators must plead "sufficient detail regarding [Defendants' federal submissions]' contents such that [Defendants] and the Court can discern some particular false statement(s)." ECF No. 55 at 19–20. However, as explained above, Relators have not meaningfully engaged with the content of Defendants' submissions apart from the text of the certifications themselves. They have not explained "why any particular false statement would have caused the government to keep the funding spigot open," or provided "specifics about" how the

funds were paid for each claim. *Id.* at 19 (quoting *Gross*, 415 F.3d at 605). Thus, the County is correct that Relators miss the mark as to this separate directive from the Court's prior order as well. And as the County further argues, this issue is problematic for the additional reason that, to the extent these facts are not known or alleged "on information and belief," Relators do not plead accessibility or the grounds for their suspicions. ECF No. 66 at 4, 10. The second amended complaint is deficient in these respects as well.

The County also argues that certain of Relators' allegations, such as that HACM and the County "maintained the status quo by placing *all* very low-income minority, disabled, and elderly persons within the containment zones in dwellings that were and are unsafe, unsanitary, indecent, and unsuitable," are conclusory and false. ECF No. 66 at 6 (quoting ECF No. 58 at 83). The County cites to another portion of the second amended complaint, which pleads with citation to HUD authority that "[a] family that is issued a housing voucher is responsible for finding a suitable housing unit of the family's choice." ECF No. 58 at 57 (citing Housing Choice Vouchers Fact Sheet, *HUD*, *available at* https://www.hud.gov/ (last visited Sept. 27 2023)). Thus, "Relators knew the participant, not the County, chose where to live," and their failure to "carefully review their amended complaint" for accuracy flouts the Court's prior order. ECF No. 66 at 7 (citing ECF No. 55 at 29).

Similarly, the County contends that any allegation that it participated in decisions about the Clark House rooming house in the NWS using CDBG funding, *see, e.g.*, ECF No. 58 at 38, is false because the County "cannot use CDBG funds within the City of Milwaukee." ECF No. 66 at 9 (citing County's 2021 CAPER). The County also raised this issue in its first

motion to dismiss, but the same allegation is still pleaded in the second amended complaint, despite the Court's warning. ECF No. 46 at 10.[7]

Relators did not respond to either of these assertions, instead reiterating their allegations from the second amended complaint (which is the tactic they generally take throughout the opposition brief). ECF No. 73 at 47–57.[8] Unlike the examples the City raises of inaccuracy, *see supra* note 5, these facts are not debatable inferences, and one of them is contradicted by Relators' own pleading. Thus, this issue, too, is an independent basis for dismissal. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) ("[C]ourts [should] avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard.").

## 4.  CONCLUSION

For the reasons set forth above, the Court grants the City's, HACM's, and the County's motions to dismiss Relators' second amended complaint. At this juncture, the dismissal will operate with prejudice. "[I]n court, as in baseball, three strikes and you're out." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 819 (7th Cir. 2013). While Relators' grievances are legitimate and it is certainly true that Milwaukee suffers from complex socioeconomic

---

[7]The Court understands the County's frustration that Relators plead that the County has "ignored" their concerns about placement of sex offenders in the NWS, given that authority for placement of sex offenders lies solely with the Wisconsin Department of Corrections. ECF No. 66 at 12 (citing Wis. Stat. § 939.615). But that fact does not render Relators' assertion demonstrably false.

[8]As the Court has observed in other cases, "the Court has to wonder how [Relators'] opposition brief spans [over 60 pages], and yet says so little of substance in response to [Defendants'] actual arguments." *Cielak v. Nicolet Unified High Sch. Dist.*, No. 22-CV-819-JPS, 2023 WL 6388933, at *24 n.34 (E.D. Wis. Sept. 29, 2023).

problems, Relators have not threaded the needle between their factual allegations and the applicable pleading and legal standards.

Accordingly,

**IT IS ORDERED** that Defendants City of Milwaukee and City of Milwaukee Community Development Grants Administration's motion to dismiss for failure to state a claim, ECF No. 62, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Housing Authority of the City of Milwaukee's motion to dismiss for failure to state a claim, ECF No. 60, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Milwaukee County's motion to dismiss for failure to state a claim, ECF No. 65, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of October, 2023.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge